Terence A. SILFIES and Sharon A. Silfies, Appellants,

v.

Suzann WEBSTER, Appellee (Two Cases).

Superior Court of Pennsylvania.

Argued Oct. 23, 1997.

Filed June 1, 1998.

John J. Keller, Allentown, for appellants.

John Evanoff, Allentown, for appellee.

Before McEWEN, President Judge, and CERCONE, President Judge Emeritus, and BECK, J.

CERCONE, President Judge Emeritus:

This is a consolidated appeal from two separately entered orders of the Court of Common Pleas of Lehigh County that dismissed the appellants' two child custody complaints. We reverse and remand for further proceedings in accordance with this opinion.

The subject of the two separate child custody actions, which form the basis for this consolidated appeal, is G.W., who was born on July 20, 1991. The appellee (defendant in both child custody actions in the trial court),

Suzann Webster, is the adoptive mother of G.W's biological mother, N.T. 7/19/96 at 20. In April of 1994, G.W. was living with Ms. Webster, who was taking care of him. *Id.* at 17–18. Apparently, the biological mother of G.W. was not participating whatsoever in the raising of G.W., and proceedings to terminate her parental rights had already been commenced at that time by Ms. Webster.[1] *Id.*

In the immediately preceding months, the appellants (plaintiffs in both child custody actions in the trial court), Mr. and Mrs. Silfies, were in the process of actively searching for a child to adopt. *Id.* at 16. Consequently, Mr. and Mrs. Silfies had made inquiries of adoption agencies and also had made their search known to a private attorney. *Id.* Mrs. Silfies was aware that this particular attorney had adopted a child privately, so she told the attorney to contact her if the attorney ever became aware of a child available for adoption. *Id.*

In early April of 1994, the attorney contacted Mrs. Silfies and informed her that there was a child available for adoption, and if Mrs. Silfies was interested, the attorney would set up a meeting. *Id.* at 17. The child in question was G.W. as, apparently, Ms. Webster had contacted this same attorney regarding options for the care of G.W. *Id.* at 69. Mrs. Silfies agreed to the meeting, which took place at Ms. Webster's house on April 7, 1994. *Id.* at 17, 70. It was at that meeting that the Mr. and Mrs. Silfies first met G.W.

After the first meeting, G.W. began to visit at the Mr. and Mrs. Silfies' house, regularly two to four times a week. *Id.* at 21. This continued throughout 1994 and began, in October of the year, to include overnight stays. *Id.* In January of 1995 the Mr. and Mrs. Silfies specially prepared a room for G.W. in their home for the child to stay during visitations. *Id.* at 23–24. Thereafter, from January of 1995 to August of 1995 visitations and overnight stays took place on a regular basis, and G.W. stayed, on average, five days a week with Mr. and Mrs. Silfies. *Id.* at 25, 73–74.

---

1. There was no mention in the record of the identity of G.W.'s biological father, although, from the testimony given it does not appear that he had any contact at all with G.W. after the child's birth, and his whereabouts are unknown.

Mr. and Mrs. Silfies filed a Report of Intention to Adopt G.W. with the Court of Common Pleas of Lehigh County in June of 1995.[2] Trial Court Opinion filed 2/6/97 at 2. Shortly, thereafter, Ms. Webster sent a letter to the appellant's attorney, along with G.W.'s birth and adoption certificates, stating that, while she was "agreeable to the adoption" she wished to maintain rights as G.W.'s grandmother, which included unlimited phone contact and weekly visitation. N.T. 7/19/96 at 33, Plaintiff's Exhibit 3, dated 7/19/96, at 1. The letter went on to say, "To have the best chance in life [the child] needs to have young parents and especially a father figure, and I know that the Silfies will be good parents for him." *Id.* After a change of attorneys, Mr. and Mrs. Silfies' new attorney prepared a "Grandparents' Visitation Agreement" and forwarded it to Ms. Webster, but this agreement was never signed by Ms. Webster. Trial Court Opinion filed 2/6/97 at 2.

From August of 1995 until March 25, 1996, the visitations of G.W. with Mr. and Mrs. Silfies became irregular. N.T. 7/19/96 at 36, 39. The length of G.W's stays with Mr. and Mrs. Silfies varied during this time period from as few as three consecutive days to as long as seven consecutive days. There was not, however, the steady five days a week routine, which had existed prior to August of 1995. *Id.* at 36. Nevertheless, contact between G.W. and Mr. and Mrs. Silfies was maintained until March 25, 1996. That was the last date G.W. ever stayed at Mr. and Mrs. Silfies' home. *Id.*

Mr. and Mrs. Silfies commenced a custody action on March 28, 1996.[3] Trial Court Opinion dated 2/6/97 at 2. Ms. Webster filed

Preliminary Objections to the Custody Complaint on April 24, 1996 based upon Mr. and Mrs. Silfies' alleged lack of standing. *Id.* at 39. Meanwhile, on May 20, 1996 the parties mutually agreed that Mr. and Mrs. Silfies could see G.W. once a week with a psychologist serving in the role of a mediator. *Id.* However, Mr. and Mrs. Silfies only saw G.W. once under this agreement and that was the very same day the agreement was executed, May 20, 1996. *Id.* at 41–42. Thereafter, Ms. Webster did not allow further visitation because of the pending custody proceeding. Trial Court Opinion dated 2/6/97 at 2.

On July 19, 1996, the trial court held a hearing restricted to the issue of Mr. and Mrs. Silfies' standing to maintain a custody action. Mr. and Mrs. Silfies, Ms. Webster and Michelle Hummel, a child-care worker at G.W.'s day-care center testified at the hearing. N.T. 7/19/96 at 2. After the hearing, the trial court entered an order on August 5, 1996 sustaining Ms. Webster's Preliminary Objections and dismissing the custody action. Mr. and Mrs. Silfies then filed a Notice of Appeal to our Court on September 4, 1996 and simultaneously filed a Motion to Reconsider with the trial court. We do not discern from the record that the trial court took any action on the Motion to Reconsider.[4]

During this time period, on August 12, 1996, Mr. and Mrs. Silfies filed another complaint against Ms. Webster seeking partial physical custody and/or visitation of G.W. Complaint filed 8/12/96 at 1.[5] Ms. Webster filed Preliminary Objections to this complaint, as well, on September 5, 1996. On November 4, 1996, after hearing, the trial court signed an order granting this set of

---

**2.** The termination of G.W.'s biological mother's parental rights was completed in September of 1994, at which time Ms. Webster adopted G.W. At the hearing of July 19, 1996, Ms. Silfies gave uncontroverted testimony that she and her husband were prepared to adopt G.W. at that time. However, according to Ms. Silfies, Ms. Webster stated that a judge had informed her to wait six (6) months before again putting G.W. up for adoption. N.T. 7/19/96 at 22. Ms. Webster did not dispute this testimony.

**3.** This action was docketed in the trial court at 96–FC–413 and was originally docketed in our Court at No. 3200 PHL 96.

**4.** The trial court had the authority to reconsider its judgment, but it was not required to act on the motion. The exercise of a trial court's authority to reconsider is purely discretionary. *See* Pa.R.A.P., Rule 1701(b)(3)(i), 42 Pa.C.S.A., *Moore v. Moore*, 535 Pa. 18, 25, 634 A.2d 163, 167 (1993).

**5.** This action was docketed in the trial court at 96–FC–1060 and was originally docketed in our Court at No. 4358 PHL 96.

preliminary objections and dismissing this complaint also. This order was entered on the docket on November 8, 1996. On December 4, 1996 Mr. and Mrs. Silfies filed another Notice of Appeal to our Court and another Motion to Reconsider with the trial court. We see from the record that the trial court took no action on this motion, either. On February 27, 1997, our Court, *sua sponte* consolidated both appeals and designated the consolidated appeal No. 4358 PHL 1996, which is the subject of this opinion.

In this consolidated appeal, the appellants present two issues for consideration by our court:

I. DID APPELLANTS PROVIDE ADEQUATE EVIDENCE OF THEIR SINCERE, SUBSTANTIAL, AND SUSTAINED INTEREST IN [G.W.] TO SATISFY THE REQUIREMENTS FOR STANDING UNDER CIRCUMSTANCES WHERE THE CHILD RESIDED WITH APPELLANTS FOR EXTENDED PERIODS, FORMED A BOND WITH APPELLANTS AND VIEWED THEM AS HIS PARENTS, AND WHERE APPELLANTS PARTICIPATED SIGNIFICANTLY IN THE CHILDS EDUCATION, GROWTH AND DEVELOPMENT?

II. DID APPELLANTS ESTABLISH THEIR IN LOCO PARENTIS STATUS WITH [G.W.] SO AS TO ALLOW THEM TO RETAIN THEIR STANDING TO BRING A CUSTODY AND/OR VISITATION ACTION AGAINST THE ADOPTIVE MOTHER EVEN AFTER THE ADOPTIVE MOTHER REVOKED HER CONSENT TO THE ADOPTION OF [G.W.] BY APPELLANTS?

Appellant's Brief at 4. Since both of these issues are interdependent, we shall address them simultaneously.

■ We begin by noting our standard of review. When reviewing an order of the trial court in a custody matter:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this ... does not vest in the reviewing court the duty or privilege of making its own determination. Thus an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's findings; and thus represent a[n] ... abuse of discretion.

*Moore v. Moore,* 535 Pa. 18, 28, 634 A.2d 163, 168 (1993) (quoting *McMillen v. McMillen,* 529 Pa. 198, 202, 602 A.2d 845, 847 (1992).) [6] *J.A.L. v. E.P.H.* 453 Pa.Super. 78, 682 A.2d 1314, 1318 (1996). Thus, the ultimate test is "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Moore,* 535 Pa. at 28, n. 4, 634 A.2d at 168, n. 4. Based on our review of the record and the applicable law, we are constrained to hold that the trial court's finding of Mr. and Mrs. Silfies' lack of standing to maintain an action for custody or visitation was unreasonable.

■ "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). As our Court has said:

The question of standing is rooted in the notion that for a party to maintain a challenge to an official order or action, he must be aggrieved in that his rights have been invaded or infringed. The law of standing provides that one cannot evoke the jurisdiction of the court to enforce private rights or to maintain a civil action for the enforcement of such rights, unless he or she has, in an individual or representative capacity, some real interest in the cause of action, or a legal right, title or interest in the subject matter or controversy.

*Campbell v. Campbell* 448 Pa.Super. 640, 672 A.2d 835, 837 (1996).

---

6. *Moore* clarified the quoted language in *McMillen* to be a definition of an appellate court's standard of review not scope of review, and the precise standard to be abuse of discretion not

"gross" abuse of discretion as originally used in *McMillen. Moore,* 535 Pa. at 28, n. 4, 634 A.2d at 168, n. 4.

In *In re T.J.* 699 A.2d 1311 (Pa.Super.1997), *appeal granted,* 1998 Pa.Lexis 482 (Pa. Mar. 20, 1998), we reiterated the definition of the terms aggrieved party and substantial interest as used in the standing context. We said:

> In order to be 'aggrieved' a party must have: 1) a **substantial** interest in the subject matter of the litigation; 2.) the party's interest must be **direct** and, 3.) the interest must be **immediate** and not a remote consequence of the action ... A 'substantial' interest means that there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law.

*Id.* at 1315–1316 (*quoting South Whitehall Twp. Police Service v. South Whitehall Twp.* 521 Pa. 82, at 86–87 555 A.2d at 793 (1989)) (*emphasis in original*).

The application of the law of standing to child custody cases is done with a high degree of scrupulousness by our courts. *J.A.L. v. E.P.H.* 682 A.2d at 1319. This is "not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well meaning." *Id., Jackson v. Garland,* 424 Pa.Super. 378, 622 A.2d 969, 971 (1993). Consequently, our courts take the view that in a dispute involving custody of a minor child, persons other than the child's parents are considered "third parties" *Argenio v. Fenton,* 703 A.2d 1042, 1044 (Pa.Super.1997); *Van Coutren v. Wells,* 430 Pa.Super. 212, 633 A.2d 1214, 1216 (1993). Third parties will not be found to have standing by our court unless the third party has a "prima facie right to custody." *Argenio,* 703 A.2d at 1044, *J.A.L.,* 682 A.2d at 1319.

However, we have recognized that an individual's "prima facie right to custody" does not derive solely and exclusively from his or her status as a parent. *J.A.L.,* 682 A.2d at 1319, *Mollander v. Chiodo* 450 Pa.Super. 247, 675 A.2d 753, 755 (1996) (discussed at greater length *infra* ), *Campbell v. Campbell,* 672 A.2d at 836. A "prima facie right to custody" may arise by the conduct of a third party, when the third party has stood *in loco parentis* to the child for whom he or she is seeking custody. *J.A.L.,* 682 A.2d at 1319, *Cardamone v. Elshoff,* 442 Pa.Super. 263, 659 A.2d 575, 581 (1995). In *Argenio, supra,* we set forth our Court's long-accepted definition of what it means for a party to stand *in loco parentis* as follows:

> [t]he phrase 'in loco parentis' refers to a person who puts himself[/herself] in the situation of assuming the obligation incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties.

*Argenio,* 703 A.2d at 1044, *quoting Van Coutren v. Wells, supra,* 633 A.2d at 1216.

In reviewing the record before us, we find ample and credible evidence that from the very beginning of their relationship with G.W., Mr. and Mrs. Silfies began to care for G.W. with the intent of adopting him as soon as practicable. N.T. 7/19/96 at 17. Ultimately allowing G.W. to be adopted by Mr. and Mrs. Silfies was also the intent of Ms. Webster when she began allowing the visitations and overnight stays of G.W. *Id.* at 18, 69–70.[7] Thus Mr. and Mrs. Silfies must be classified as "prospective adopting parents." We have held, previously, that prospective adoptive parents who have stood *in loco parentis* to a minor child have standing to commence a subsequent legal proceeding involving the child.

*In re Baby Boy S.,* 420 Pa.Super. 37, 615 A.2d 1355 (1992), *affirmed Per Curiam* 540 Pa. 302, 657 A.2d 484 (1995) is the first of three cases that clearly establish this principle. In this case, a teenage girl gave birth to a child out of wedlock, and, shortly thereaf-

---

7. Ms. Webster testified at the hearing of 7/19/96 that she no longer consents to the adoption of G.W. N.T. 7/19/96 at 76. However, as discussed, *supra,* at the time Mr. and Mrs. Silfies had filed their Report of Intention to Adopt with the Court of Common Pleas of Lehigh County, Ms. Webster indicated via her letter to the Silfies' attorney that she was "agreeable to the [pending] adoption." *Id.* at 33, Plaintiff's Exhibit 3, dated 7/19/96, at 1.

ter, she moved in to a shelter for unwed mothers. The girl informed one of the directors of the shelter that she wished to put the child up for adoption. The shelter director then arranged for a meeting between the girl and a couple wishing to adopt. After the meeting, the teen signed an "entrustment agreement" which was prepared by the couple's attorney and the teen gave the baby to the couple. The teen then left the shelter. *Id.* 615 A.2d at 1357.

The couple filed a report of their intention to adopt, but, shortly thereafter, the teen revoked the entrustment agreement and sought the child's return. The trial court later terminated the teen's parental rights. On appeal to our court, the teen argued that the prospective adoptive parents lacked standing to maintain a termination action because of, inter *alia,* the revocation of the entrustment agreement and the fact that the adoptive parents were never granted custody. *Id.*

■ We rejected those factors as being nondispositive. We found that the adoptive parents had attained *in loco parentis* status, and hence standing, by virtue of both the entrustment agreement and the filing of the report of the intention to adopt. *Id.* at 1357–1358. We also rejected the argument that loss of physical custody by the adoptive parent or revocation of consent by the natural parent automatically deprives the prospective adoptive parents of standing. *Id.* at 1358. Therefore, by applying these principles of standing to the case before us, Ms. Webster's decision to revoke her consent to the adoption and cease G.W.'s visitation did not automatically deprive Mr. and Mrs. Silfies of standing. Mr. and Mrs. Silfies' standing stems from their prior relationship with G.W. as prospective adoptive parents.

The holding of in *In re Baby Boy S.,* served as the foundation of our Court's decision in *Mollander v. Chiodo,* 450 Pa.Super. 247, 675 A.2d 753 (1996), which directly established the principle that prospective adoptive parents have the right to maintain a custody action. In *Mollander,* a young un-

wed mother placed her three-month old daughter with a couple. The couple filed a report of intention to adopt a few weeks later and subsequent to that a petition to adopt which had the mother's consent to adopt attached. The mother later changed her mind and petitioned to have her consent to the adoption revoked, which the trial court granted. *Id.* 675 A.2d at 755.

The adoptive parents then filed a custody complaint in which they claimed to stand "in loco parentis" to the minor child.[8] *Id.* The trial court awarded custody to the prospective adoptive parents. *Id.* at 754. On appeal we affirmed the trial court's award of custody, and we again rejected the argument that revocation of the consent to the adoption by the mother negated the adoptive parents standing. *Id.* at 756. We specifically held that the adoptive parents achieved *in loco parentis* status and had standing to maintain an action for the custody of the minor child. *Id.*

Recently, in *In re Griffin,* 456 Pa.Super. 440, 690 A.2d 1192 (1997), *appeal denied* 549 Pa. 701, 700 A.2d 441 (1997), *cert. denied, Derzack v. Allegheny County Children and Youth Services,* —— U.S. ——, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998), we applied this specific holding of *Mollander.* The appellants in *Griffin,* a married couple, were appealing the removal by Juvenile Court of a child in their custody. The parents had initially been caring for the minor child as a foster child. On appeal to our Court, the appellee, Children and Youth Services, challenged the right of the appellant's to contest the Juvenile Court Order, as Pennsylvania law did not recognize the standing of foster parents to pursue custody of former foster children. *Id.* 690 A.2d at 1200–1201. The appellants, though, had sought permission from the Juvenile Court to adopt the minor child during the time of the foster care. Consequently, our Court specifically ruled, relying on our prior holding in *Mollander,* that the couples' change in status from foster parents to **prospective adoptive parents**, while they were caring for the minor child,

8. Both of appellants' complaints for custody contain an identical averment. Custody Complaint filed 3/28/96 at paragraph 7(d); Complaint for Custody and Visitation filed 8/12/96 at paragraph 20(f).

was sufficient to establish their standing to maintain the appeal and seek the return of the child to their custody. *Id.* at 1201 (emphasis supplied).

While conceding that *Mollander* was "factually similar," the trial court distinguished *Mollander* on the basis of the fact that the appellants were never given custody of the child and that Appellee never formally consented to the adoption.[9] Trial Court Opinion filed 2/6/97 at 6. However, we reiterate, neither the lack of a formal award of custody, nor revocation of prior consent to adoption by a minor child's mother will operate to deprive prospective adoptive parents of standing to utilize our court system in a proceeding involving the minor child. *In re Baby Boy S., supra.* This is because the concept of standing has as its root the notion that an injury to a party's legally protected interest enables that party to seek relief from that injury from our courts. *Campbell, supra.* Prospective adoptive parents have such a legally cognizable and protectable interest.

Prospective adoptive parents are not "strangers" seeking to invade the secure family unit for nefarious ends. Quite to the contrary, as this Court explained in *Mitch v. Bucks County Children and Youth Social Service Agency,* 383 Pa.Super. 42, 556 A.2d 419 (1989), *appeal denied, In re Mitch,* 524 Pa. 621, 571 A.2d 384 (1989):

> [P]rospective adoptive parents, unlike foster parents, have an expectation of permanent custody which, though it may be contingent upon the agency's ultimate approval, is nevertheless genuine and reasonable. Because of this expectation of permanency, prospective adoptive parents are encouraged to form emotional bonds with the child from the first day of the placement. By removing the child from the care of the prospective adoptive parents, the agency forecloses the possibility of adoption. In light of the expectation of

permanent custody that attends an adoptive placement, an agency's decision to remove a child constitutes a direct and substantial injury to prospective adoptive parents. Because prospective adoptive parents, unlike foster parents, suffer a direct and substantial injury when an agency removes a child from them, we see no reason why in law or policy why we should limit their standing to sue for custody.

*Id.* 556 A.2d at 423.

Whether the adoption process proceeds through an agency or a private party is irrelevant. *See e.g. In re Adoption of J.M.E.* 416 Pa.Super. 110, 610 A.2d 995 (1992), *appeal denied* 533 Pa. 612, 618 A.2d 402 (1992) (husband and wife caring for child received from relatives of the natural mother held to have standing to maintain termination of parental rights action). The reason is that the same factors, which serve as the foundations of adoptive parents' standing, are present in both instances.

■ In our case, Mr. and Mrs. Silfies, as prospective adoptive parents, had a reasonable expectation that they would be the future permanent custodians of G.W. This gave them a definite and substantial interest in the future welfare of G.W., which they had the right to seek the court's intervention to protect. As we emphasized in *Mitch, supra,* deprivation of the prospective adoptive parents' interest by the cessation of the adoption process can cause a direct and substantial serious injury to the prospective adoptive parents. Many prospective adoptive parents, like Mr. and Mrs. Silfies, invest a significant amount of time and effort in developing a caring and nurturing relationship with the adoptive child. The prospective adoptive parents do so because they have a legitimate expectation of the relationship's permanency. When the relationship is severed there is an emotional toll, which can be severe, particu-

---

9. The trial court also accorded much weight to the fact that Ms. Webster still performed certain parental duties such as authorizing medical treatment for G.W., choosing G.W.'s day care center and paying G.W.'s medical insurance. Trial Court Opinion at 4–5. However, the Silfies were not legally authorized to assume any of these responsibilities as the adoption of G.W. was

not yet complete. As discussed *infra,* the Silfies assumed parental duties and responsibilities to the extent that they were legally permitted. Ms. Webster's performance of her legally required responsibilities to G.W. did not change Mr. and Mrs. Silfies' status as prospective adoptive parents or negate their assumption of certain parental responsibilities, while G.W. was in their care.

larly where, as here, obvious emotional and psychological bonds have been formed between the prospective adoptive parents and the child.

It is very evident from the record in the present case, that once the visitations and overnight stays of G.W. began, Mr. and Mrs. Silfies conducted themselves in a manner towards G.W., consistent with that of natural parents to their child, since they assumed a considerable number of the duties and responsibilities which are incidental to parental status. They completely converted a room for G.W. in their home and specially outfitted it with furniture, stuffed animals and toys. N.T. 7/19/96 at 24–25. While G.W. was staying with them, Mr. and Mrs. Silfies paid for all necessities, including food and clothing. *Id.* at 62, 87. Mr. and Mrs. Silfies transported G.W. to and from G.W.'s pre-school/day-care center. *Id.* at 25. They took an active interest in G.W.'s daily activities at the center and routinely inquired of G.W.'s teachers as to G.W.'s academic progress and in-class behavior. *Id.* at 65. Together, Mr. and Mrs. Silfies and G.W. shared in a variety of outings such as fishing, farm shows, carnivals and even G.W.'s pre-school costume party. *Id.* at 53. Apparently Mr. and Mrs. Silfies also navigated G.W. through the very demanding but very necessary process of potty training. *Id.* at 53. They also administered prescribed medicine to G.W., if G.W. became ill while G.W. was staying with them. *Id.* at 90. By performing parental duties such as these, it is clear, then, that Mr. and Mrs. Silfies, who fully expected to adopt G.W., were acting *in loco parentis* toward G.W. As we said in *J.A.L., supra,* "Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party [who assumed parental duties] be granted standing so as to have the opportunity to litigate fully the issue of whether the relationship should be maintained even over a natural parent's objection." *J.A.L.,* 682 A.2d at 1320.

We recognize and appreciate the efforts of the learned trial judge to conscientiously apply the law to a difficult case as this. N.T. 11/4/96 at 14. For clarity, we must therefore emphasize that our finding of standing is a preliminary determination, which merely enables the custody and visitation action to go forward. We have said:

> A finding of a prima facie right sufficient to establish standing does not affect that parties evidentiary burden: in order to be granted full or partial custody, he or she must still establish that such would be in the best interests of the child under the standards applicable to third parties.

*J.A.L., supra,* 682 A.2d at 1319.

Accordingly, the orders of the Court of Common Pleas of Lehigh County dated August 5, 1996 and November 4, 1996 respectively are hereby reversed.

This case is remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

McEWEN, President Judge, dissents.