## In re ADOPTION OF W.C.K. (Three Cases).

### Appeal of A.M.K., Natural Mother of W.C.K. (Three Cases).

Superior Court of Pennsylvania.

Argued Oct. 19, 1999.

Filed March 6, 2000.

Reargument Denied March 24, 2000.

James E. Mahood, Pittsburgh, for appellant.

Nick Francalancia, Beaver, for appellee.

Laura J. Tocci, Aliquippa, Terri J. Mitko, Beaver and Samuel C. Totaro, Jr., Bensalem, for participating party.

Before JOHNSON, FORD ELLIOTT and OLSZEWSKI, JJ.

JOHNSON, J.:

¶ 1 This appeal presents the question of what threshold of compliance with the statutory requirements of the Adoption Act, 23 Pa.C.S. §§ 2101–2910, must be met to invoke a trial court's jurisdiction to hear a petition for the involuntary termination of parental rights filed by a party claiming standing under 23 Pa.C.S. § 2512(a)(3). We hold that a petitioner's strict compliance with the requirements of the Adoption Act is a prerequisite to a court's jurisdiction to hear a petition to terminate parental rights. We here conclude that the Petitioners did not stand *in loco parentis* to the proposed adoptee because they did not assume parental status through any legally cognizable means and, alternatively, because the Petitioners' report of intention to adopt was defective on its face. Therefore, we reverse the trial court's orders granting the petitions to terminate the natural parents' rights due to a lack of jurisdiction to hear the petitions.

¶ 2 This is a consolidated appeal from orders terminating A.M.K.'s [hereinafter "Mother"] rights and the putative father's rights to their male child, W.C.K., and dismissing Mother's petition for habeas corpus. W.C.K. was born on March 21, 1998, at Magee–Women's Hospital in Allegheny County. Mother was nineteen years old at the time of W.C.K.'s birth. Immediately after W.C.K.'s birth, Mother and W.C.K. both lived with Mother's father and stepmother in Carnegie, Allegheny County. On April 7, 1998, Mother, still nineteen years-old at the time, began to feel overwhelmed by her responsibilities for caring for W.C.K. and decided to place W.C.K. with Norma Kiefer, a family friend who also lived in Carnegie. The next day, Mother's father asked Mother to leave his home. Mother then joined W.C.K. at Kiefer's home. While living with Kiefer, Mother worked at a restaurant and paid Kiefer bi-weekly rent of $100. However, Mother continued to feel that she was unable to adequately care for W.C.K. Consequently, Mother made an agreement with Kiefer that Kiefer would take care of W.C.K. until Mother could get "back on [her] feet." N.T., 9/29/98, at 24. Pursuant to their agreement, on April 30, 1998, Mother and Kiefer, without legal counsel, executed a written "Guardianship Agreement" [hereinafter "Agreement"] which states:

I [Mother], mother of [W.C.K.], born on March 21, 1998, grant guardianship of [W.C.K.] to Norma J. Kiefer, maintaining her residence at 613 Fifth Avenue, Carnegie, Pennsylvania 15106.

Norma J. Kiefer will have guardianship of [W.C.K.], but Mother will continue to receive her [WIC benefits] with Norma J. Kiefer being the proxy on her card. This Agreement gives Norma J. Kiefer the right to execute any medical documents concerning [W.C.K.] and obtain any medical needs for [W.C.K.] which includes any emergency, doctor, treatments, appointments, x-rays, etc.

[W.C.K.] will be residing at 613 Fifth Avenue, Carnegie, Pennsylvania 15106 (Norma J. Kiefer's residence) and Mrs. Kiefer will take full responsibility for [W.C.K.] in everyway [sic].

Petitioners' Exhibit No. 1. Both Kiefer and Mother testified that the Agreement was a temporary one. Mother left Kiefer's residence on June 24, 1998, and rented her own apartment. Mother testified that her intent was to have W.C.K. live with her "as soon as [she] got everything situated at the apartment."

¶ 3 However, shortly after Mother began living in her own apartment, Mother's psychological health deteriorated precipitously. On July 5, 1998, Mother was hospitalized following a failed suicide attempt. However, despite Mother's poor psychological health, Mother communicated to Kiefer Mother's desire to be reunited with W.C.K. on two different occasions during July. Notwithstanding Mother's attempts at reunification with W.C.K., on August 4, 1998, Kiefer gave W.C.K. away to Deborah Lancos DeCostro and Ronald A. DeCostro [hereinafter the "DeCostros"], who reside in Monaca, Beaver County. W.C.K. was less than five months old. Immediately, the DeCostros filed both their Report of Intention to Adopt and their Petitions for the Involuntary Termination of Parental Rights. On September 9, 1998, Mother was served with notice of a termination hearing. On September 29, 1998, the Orphans' Court of Beaver County, the Honorable Robert C. Reed, P.J., presiding, convened a hearing on the petition for termination of Mother's rights. On November 4, 1998, Judge Reed held a second hearing on the petition to terminate the rights of the putative father and on the Mother's petition for habeas corpus. On that same date, Judge Reed entered a *decree nisi* terminating the parental rights of the putative father. On November 23, 1998, Judge Reed denied Mother's petition for habeas corpus. On December 14, 1998, Judge Reed entered a *decree nisi* terminating Mother's parental rights to W.C.K. On April 23, 1999, Judge Reed dismissed Mother's exceptions to the *decree nisi* and made final the order terminating Mother's parental rights to W.C.K. Mother's appeals from the three foregoing decisions have been consolidated into the instant appeal.

¶ 4 Mother presents the following questions for our review:

I. Whether a parent in parental termination proceedings is entitled to be served with notice of the factual and legal grounds asserted against her?

II. Whether a stranger to the child and birth parent may obtain in loco parentis status and standing to bring parental termination proceedings where that person obtains possession of a child without the consent of and over the opposition of the birth parent?

III. Whether § 2511(a)(6) of the Adoption Act can be applied to terminate the rights of a birth mother?

IV. Where there has been no voluntary placement for purposes of adoption, does equal protection of the laws require that a parent be entitled to the protections of the Juvenile Act prior to the removal of a child from a parent's custody and the termination of that parent's parental rights?

V. Whether the record establishes by clear and convincing evidence that Mother's parental rights may be terminated under § 2511(a)(6) of the Adoption Act?

VI. Whether Mother's right to due process and objection to the standing of the moving party in proceedings to terminate her parental rights can be waived on the record herein?

VII. Whether a mother whose parental rights have not been terminated has standing to object to the termination of parental rights of her child's father?

VIII. Whether a mother whose parental rights have not been terminated may bring a petition for habeas corpus to obtain custody

of her child where that child is being held by a stranger without the mother's consent and over her objection?

IX. Whether the trial court has a duty to disclose its prior relationship to a litigant to another litigant in the case?

Appellant's Brief at 8–9. As we find it necessary to address only the first, second, and eighth questions to dispose of this appeal, we shall not address the remaining questions presented.

 ¶ 5 Initially, Mother argues that notice was insufficient and that the DeCostros lack standing to petition for the termination of Mother's parental rights to W.C.K. Judge Reed concluded that Mother waived these issues by failing to make timely objections at trial. Trial Court Opinion, 4/23/99, at 7–8. We agree with Judge Reed that the entry of appearance by Mother's attorney and her subsequent participation in the termination hearing without objection to sufficiency of notice waived any claim personal to Mother on this issue. *See Brown v. Philadelphia Tribune Co.*, 447 Pa.Super. 52, 668 A.2d 159, 162 (1995) (stating that an appellant must make a timely objection at trial to properly preserve an issue for appeal); Pa.R.C.P. 1030(a) (Waiver of Defenses); Pa.R.C.P. 1028(a)(1) (Preliminary Objections). However, we disagree with Judge Reed's conclusion that Mother's failure to object to standing waives this issue.

 ¶ 6 In point of fact, this issue cannot be waived as the DeCostros' lack of standing establishes conclusively that the trial court had no jurisdiction to hear this case. In general, the issue of standing is distinguishable from subject matter jurisdiction. *See Hertzberg v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43, 46 n. 6 (1998). However, this principle is inapplicable to statutory causes of action. When our legislature has designated who may bring an action under a particular statute, a court does not have jurisdiction over the action

unless the party bringing the action has standing.

[W]hen a statute creates a cause of action and designates who may sue, the issue of standing becomes interwoven with that of subject matter jurisdiction. **Standing then becomes a jurisdictional prerequisite to an action.** It is well-settled that the question of subject matter jurisdiction may be raised at any time, by any party, or by the court *sua sponte.*

*Grom v. Burgoon*, 448 Pa.Super. 616, 672 A.2d 823, 824–825 (1996) (emphasis added) (citations omitted). *See also Hill v. Divecchio*, 425 Pa.Super. 355, 625 A.2d 642, 645 (1993) (stating that when "a statute creating a cause of action [designates] who may sue, then standing becomes a jurisdictional prerequisite to an action"). In *Grom*, the appellant alleged that the trial court erred in raising the issue of standing *sua sponte.* The appellant was a grandparent seeking visitation rights of a child under section 5313 of the Custody and Grandparents Visitation Act. *See* 23 Pa.C.S. § 5313. We concluded that because section 5313 creates a cause of action for grandparent visitation *and* designates who may bring suit under its provisions, standing was a prerequisite for jurisdiction. *See Grom*, 672 A.2d at 825. Accordingly, we held that the trial court properly considered the question of standing *sua sponte. See id.*

¶ 7 The power of a court to review subject matter jurisdiction at any time during a proceeding is founded in Rule 1032(b) of the Pennsylvania Rules of Civil Procedure. The Rule provides:

**Rule 1032. Waiver of Defenses. Exceptions. Suggestion of Lack of Subject Matter Jurisdiction or Failure to Join Indispensable Party**

* * * *

(b) Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter or that there has been a failure to join

an indispensable party, the court shall order that the action be transferred to a court of the Commonwealth which has jurisdiction or that the indispensable party be joined, **but if that is not possible, then it shall dismiss the action.** Pa.R.C.P. 1032 (emphasis added). *See also Andursky v. Andursky*, 382 Pa.Super. 1, 554 A.2d 571, 573 (1989) (stating that "we note that the failure of either party to raise the issue of lack of subject matter jurisdiction does not prevent this Court from raising the issue *sua sponte* ").

■ ¶ 8 In the instant case, the Adoption Act provides for a cause of action to involuntarily terminate parental rights, and it designates who may file such an action. *See* 23 Pa.C.S. §§ 2511, 2512. Consequently, the DeCostros' standing under section 2512 is a prerequisite to the trial court's jurisdiction over this matter. If the DeCostros did not meet this jurisdictional prerequisite, then it was incumbent upon Judge Reed to dismiss their petitions. Moreover, our determination here that the DeCostros lack standing now compels us to reverse the orders that terminated the natural parents' parental rights and remand this matter to the Beaver County Court of Common Pleas with directions to dismiss the petitions for the termination of the parents' rights for want of jurisdiction.

■ ¶ 9 Judge Reed concluded, and the DeCostros argue, that they have standing pursuant to subsection (a)(3) of section 2512 because they stood *in loco parentis* to W.C.K. and they filed a report of intention to adopt. The statute states:

### § 2512. Petition for involuntary termination

(a) **Who may file.**—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

(1) Either parent when termination is sought with respect to the other parent.

(2) An agency.

(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).

(4) An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S. § 6341(c) (relating to adjudication).

23 Pa.C.S. § 2512(a). Mother argues that it is absurd to contend that the DeCostros have standing to terminate her parental rights to W.C.K. because the DeCostros received him from a third party who, by her own admission, was *temporarily* taking care of W.C.K. and because the third party delivered W.C.K. to the DeCostros without Mother's consent. We agree, and we are confounded by the trial court's decision to allow the DeCostros to proceed on their shoddy assertion of *in loco parentis* status.

■ ¶ 10 In order for the DeCostros to have stood *in loco parentis* to W.C.K. they must have assumed parental status through some legally cognizable means, predicated on Mother's consent to an adoptive placement. Clearly, the DeCostros do not stand *in loco parentis* to W.C.K. because Mother never intended to permanently place W.C.K. with either Kiefer or the DeCostros. *See Silfies v. Webster*, 713 A.2d 639, 643 (Pa.Super.1998) (stating that individuals were prospective adoptive parents because the natural mother's intent was for the individuals to adopt her child). *See also In re Adoption of J.M.E.*, 416 Pa.Super. 110, 610 A.2d 995, 998 (1992) (stating that the most significant factor in determining whether individuals stand *in loco parentis* to a child for purposes of section 2512 is whether the party with legal custody intended to *permanently* place the child with the individuals).

■ ¶ 11 A party stands *in loco parentis* to a child by putting "him-

self[/herself] in the situation of assuming the obligation incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas: **first, the assumption of a parental status**, and second, the discharge of parental duties." *Silfies*, 713 A.2d at 643 (emphasis added) (alteration in the original) (quoting *Argenio v. Fenton*, 703 A.2d 1042, 1044 (Pa.Super.1997)). Thus, in order for a party to stand *in loco parentis* to a child, that party must first assume parental status through some legally cognizable means. The requirement that assumption of parental status be accomplished through some legally cognizable means is absolutely essential, for it prevents persons who have gained physical possession of a minor child through illegitimate means from using the judicial system to legitimize their wrongful possession of the child. In order for there to be a legitimate assumption of parental status, it is not necessary for the natural parent to expressly consent to an adoption, but at the very least, the natural parent must agree to a permanent placement of his or her child. *See Silfies*, 713 A.2d at 643; *J.M.E.*, 610 A.2d at 998.

¶ 12 Judge Reed concluded that "it is clear that the [DeCostros] had both assumed parental status." Trial Court Opinion, 4/19/99, at 11. However, a review of the record supports only a contrary finding and reveals grave error in Judge Reed's rationale. Judge Reed relies on Kiefer's testimony that she phoned Mother on July 12, 1998, while Mother was in a psychiatric ward recovering from an attempted suicide. Judge Reed apparently finds some persuasive value in the ensuing conversation during which Kiefer told Mother that Kiefer was going to place W.C.K. for adoption. Mother, still recovering from her suicide attempt only seven days before, answered despondently, "I don't care what you do." N.T., 9/29/98, at 53. Mother's response was, at best, equivocal and cannot, under any circumstances, be received as an agreement to adoptive placement. The Trial Court Opinion also recites an incident sometime in July 1998 during which Kiefer's sister reportedly told Mother that there was a couple interested in adopting W.C.K. Mother purportedly responded "I'll call you," but then never did. Though Judge Reed again found Mother's initial response a persuasive indicator of her agreement to placement, he failed to reconcile Mother's subsequent failure to follow up with a phone call. Had Mother any real desire to relinquish W.C.K., the phone call was but a small step to take. The fact that she declined to take it renders her intention uncertain at best.

¶ 13 Furthermore, Kiefer's own admission repudiates any suggestion of consent. Both Mother and Kiefer testified that they intended the placement of W.C.K. with Kiefer to be temporary. Kiefer also testified that as late as July 22, 1998, less than two weeks before Kiefer delivered W.C.K. to the DeCostros, Kiefer was aware that Mother wanted to be reunited with W.C.K.

¶ 14 The United States Supreme Court has recognized that a parent's right to his or her child is fundamental. *See Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). For this very reason, our Commonwealth's Supreme Court has mandated that the statutory grounds for termination of parental rights may not be satisfied by less than clear and convincing evidence. *See In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 885–86 (1986). We conclude that the foregoing facts do not establish by clear and convincing evidence that Mother ever affirmatively agreed to permanently place W.C.K. with Kiefer or the DeCostros. Moreover, we find the trial court's conclusion to the contrary patently unreasonable. The evidence on which it relies is, quite simply, insufficient.

¶ 15 The DeCostros mistakenly assert that "[t]he important issue is what did the adoptive parents expect at the time of the placement." Appellee's Brief at 16–18. The trial court resolved the issue on the basis of the expectations and acts of

the DeCostros in regard to W.C.K. We find the court's analysis misguided. The intentions of the DeCostros are of absolutely no moment where the natural mother has not consented to the adoption and more importantly, has not even expressed a desire to permanently place the child with another party. The DeCostros rely on *Silfies* and *J.M.E.* as authorities for their argument. For the following reasons, we conclude that the DeCostros and Judge Reed have misconstrued the case law, and we reiterate that in order for the DeCostros to have stood *in loco parentis* to W.C.K. there must have been a legitimate assumption of parental status predicated on Mother's consent to an adoptive placement.

¶ 16 In *Silfies*, the appellants, Mr. and Mrs. Silfies, sought to adopt G.W. whose grandmother, Ms. Webster, had become his adoptive parent. In 1994, when G.W. was three years old, Ms. Webster had contacted an attorney regarding options for the care of G.W. The attorney then contacted the Silfies, who were then searching for a child to adopt. In April of 1994, a meeting was arranged at Ms. Webster's home, during which the Silfies met G.W. After the meeting, G.W. began to visit the Silfies two to four times a week. Around October of 1994, these visits began to include overnight stays. These visits continued on a regular basis through August of 1995, and in June of 1995, the Silfies filed a report of intention to adopt. Shortly thereafter, Ms. Webster sent a letter to the Silfies' attorney, along with G.W.'s birth and adoption certificates stating that Ms. Webster was "agreeable to the adoption," but that she would like to maintain rights as G.W.'s grandmother. *Silfies*, 713 A.2d at 641. Though the Silfies' attorney sent a "Grandmother Visitation Agreement" to Ms. Webster, she never signed the agreement, and between August of 1995 and March of 1996, the visits between G.W. and the Silfies became irregular. On March 28, 1996, the Silfies instituted an action for the custody of G.W., and Ms.

Webster filed preliminary objections based on the Silfies' purported lack of standing. The trial court granted the preliminary objections and dismissed the Silfies' custody action.

¶ 17 On appeal, the Silfies argued that the trial court's decision was erroneous because the Silfies stood *in loco parentis* to G.W. *See id.* at 642–43. Though we noted that the Silfies had a reasonable expectation of adopting G.W., we also stated:

Ultimately allowing G.W. to be adopted by Mr. and Mrs. Silfies was also the intent of Ms. Webster when she began allowing the visitations and overnight stays of G.W.[7] Thus Mr. and Mrs. Silfies must be classified as "prospective adopting parents." We have held, previously, that prospective adoptive parents who have stood *in loco parentis* to a minor child have standing to commence a subsequent legal proceeding involving the child.

---

7. Ms. Webster testified at the hearing of 7/19/96 that she no longer consents to the adoption of G.W. However, as discussed, *supra,* at the time Mr. and Mrs. Silfies had filed their Report of Intention to Adopt with the Court of Common Pleas of Lehigh County, Ms. Webster indicated via her letter to the Silfies' attorney that she was "agreeable to the [pending] adoption."

*Id.* at 643 (citations omitted). Clearly, we considered the fact that Ms. Webster, G.W.'s legal parent, had initially given her written consent to the adoption as significant in determining whether the Silfies could be characterized as prospective adoptive parents. Moreover, Ms. Webster's actions in allowing G.W. to visit with the Silfies for over two years, a substantial period of which G.W. stayed with the Silfies overnight five days a week, demonstrated that Ms. Webster's unequivocal intent was to permanently place G.W. Accordingly, we determined that the Silfies had standing to bring the custody action. *See id.* at 646. These facts belie the DeCostros' assertion that "[t]he *Silfies* case

provides further support for the finding that [the DeCostros] have standing in this case." Appellee's Brief at 16. It is preposterous for the DeCostros to attempt to analogize their relation to W.C.K. with the Silfies' relation to G.W. In the instant case, Mother never met the DeCostros. She never gave her permission to allow W.C.K. to visit with the DeCostros, nor did she give her written consent to the adoption. Ultimately, we cannot conclude, nor could Judge Reed, that Mother's intent was to permanently place W.C.K. with the DeCostros.

¶ 18 The DeCostros also rely on *J.M.E.* for their assertion that the most important consideration should be the intent of the DeCostros. In *J.M.E.*, the legal custodian of J.M.E. filed preliminary objections alleging that the petitioners lacked standing to bring an action for the termination of the natural mother's rights. The trial court granted the preliminary objections, and on appeal, we reversed. We noted that the appellees had given J.M.E. to the appellants with the intent that the appellants "raise" J.M.E. from the age of six weeks. In holding that the appellants stood *in loco parentis* to J.M.E., we stated:

> **Most significant**, however, **is appellees' intent** that the **placement** of [J.M.E.] with appellants was to be **permanent**.

*J.M.E.*, 610 A.2d at 998 (emphasis added). The DeCostros presented no evidence to establish Mother's intent to place W.C.K. with them. Based on the foregoing cases, we reject the DeCostros' argument that we should focus on their expectations without first discerning Mother's intent.

¶ 19 The DeCostros, in an attempt to legitimize Kiefer's wrongful transfer of W.C.K. to them, argue that the Agreement between Mother and Kiefer was an "entrustment agreement" akin to the agreement in *In re Baby Boy S.*, 420 Pa.Super. 37, 615 A.2d 1355 (1992). They argue accordingly, that Mother's purported revocation of the Agreement did not operate to deprive the DeCostros of standing. Upon a careful review of the facts of *Baby Boy S.*, we find the DeCostros' analogy demonstrably fallacious. In *Baby Boy S.*, the mother of the child gave birth to him when she was eighteen years old. Shortly after the birth, the mother took up residence in a shelter for unwed mothers. While there, the mother approached the operator and owner of the shelter, Mrs. Labish, regarding **"possible adoption of her child."** *In re Baby Boy S.*, 615 A.2d at 1357 (emphasis added). Thereafter, the Kleins, who had earlier inquired about adopting a child through Mrs. Labish, were selected to receive the child. A meeting was arranged at the Klein's home, "during which time [the mother] was shown the house, and became acquainted with the Kleins." *Id.* The next day, the mother left town after she signed an entrustment agreement with the Kleins that had been prepared by the Kleins' attorney. *See id.* Though the case does not indicate the terms of the agreement, it was obvious from the facts that the agreement was drafted in contemplation of the Kleins adopting the child. Once again, the DeCostros have relied on a case that is clearly distinguishable from the facts of the instant case. The entrustment agreement between the mother and the Kleins was signed by the mother with the intent of achieving a permanent placement for her child with the Kleins and after she had visited the Kleins at their home. In the case now before us, Mother never met the DeCostros, Mother was totally unaware of their existence, and she never exhibited the affirmative intent to achieve a permanent placement for W.C.K. with the DeCostros or anyone else.

¶ 20 As stated above, the DeCostros claim that they have standing to petition for the termination of W.C.K.'s natural parents' rights under the second clause of 23 Pa.C.S. § 2512(a)(3). In order to have standing under this subsection, the DeCostros must stand *in loco parentis* to W.C.K. **and** they must have filed their report of intention to adopt pursuant to 23

Pa.C.S. § 2531. Though the parties do not address this issue, apparently believing it satisfied by the fact that the DeCostros did file a report of intention to adopt, a careful review of the record reveals that the DeCostros did not comply with many of the statutorily mandated prerequisites to a report of intention to adopt. Section 2531 requires the report of intention to adopt include "[a] copy of the preplacement report prepared pursuant to section 2530." 23 Pa.C.S. § 2531(b)(7). A preplacement report is to be prepared by the agency or person conducting the "home study." 23 Pa.C.S. § 2530(b). A home study may only be conducted "by a local public child-care agency, an adoption agency or a licensed social worker designated by the court to perform such study." 23 Pa.C.S. § 2530(a). Pursuant to section 2530, an intermediary is prohibited from placing a child in the physical care of prospective adoptive parents before a home study is begun. *See id.* These requirements were obviously enacted by the legislature to prevent placing adoptees with unfit parents. They require the involvement of entities qualified in evaluating the best interests of a child in achieving placement with prospective adoptive parents. *See id.* In the instant case, the trial court permitted the DeCostros to wholly circumvent these requirements. Though the DeCostros initially stated that they did not receive the child from an intermediary, they later amended their report of intention to adopt, admitting that Kiefer was the intermediary. Furthermore, in their report of intention to adopt, the DeCostros stated that a home study was completed, yet they fail to attach a copy of the required preplacement report. In view of this critical inconsistency, we have grave doubts about whether a home study was ever commenced, much less completed. To this day, a preplacement report has not been filed. Without such a report, we conclude that the DeCostros' report of intention to adopt is a nullity. Consequently, this is a second basis for our conclusion that the DeCostros do not have standing under section 2512(a)(3).

¶ 21 For all the foregoing reasons, we conclude that the trial court had no jurisdiction to adjudicate this case. Thus, the orders terminating Mother's and the putative father's parental rights should be reversed and the petitions dismissed.

¶ 22 Because the petition for a writ of habeas corpus was properly filed but prematurely denied, we also reverse the order of November 13, 1998 that denied the habeas corpus petition, and we remand for any further proceedings that may be necessary to permit Mother to enforce her rights to W.C.K. *See Commonwealth ex rel. Piper v. Edberg,* 346 Pa. 512, 31 A.2d 84, 86 (1943) (concluding that it was error for the trial court not to hold a petition for habeas corpus in abeyance pending the outcome of the previously initiated adoption case).

¶ 23 In conclusion, we find the facts of this case most disturbing. This Court cannot ignore its duty to scrupulously interpret the law and to ensure that our legal system is never used to deprive our less affluent, marginalized citizens of their parental rights other than through strict adherence to legislative pronouncement. Though the DeCostros have undoubtedly developed an attachment to W.C.K., this does not excuse their initial failure to follow the legislatively mandated procedure of the Adoption Act. Unfortunately, at the time this case began, the trial court chose not to dismiss their petition, thereby sowing the seeds of the emotional bond that now may exist. The trial court failed to acknowledge that which was immediately apparent to this Court—the DeCostros' lack of standing. The Agreement upon which the DeCostros rely, and upon which Judge Reed allowed this case to proceed, amounted to little more than a contract for baby-sitting revocable at-will by W.C.K.'s natural parent. Undoubtedly, the DeCostros, who hastily filed their report of intention to adopt only three days after receiving W.C.K., also realized that something

was amiss and that they should act quickly. Rather than continue on such precarious grounds, it would have been eminently more responsible for them and the trial court, at this early stage in the proceedings, to have sought the involvement of Beaver County Children and Youth Services. Unfortunately, W.C.K. must once again suffer displacement for their unwise choice.

¶ 24 Orders **REVERSED**. Case **REMANDED** for further proceedings consistent with this Opinion.

¶ 25 OLSZEWSKI, J., joins the Opinion and files a Concurring Statement.

¶ 26 FORD ELLIOTT, J., files a Concurring Statement.

FORD ELLIOTT, J., Concurring.

¶ 1 I concur only in the result reached by the majority to reverse the orders of the trial court including the terminating of Mother's parental rights due to appellees' lack of standing. I write separately, however, to further distance myself from the majority's strong criticism of appellees and the trial court, and also because the majority's resolution of this case may very well threaten the health and well-being of W.C.K. Because this court properly has jurisdiction over the controversy and the parties, I would do more than simply remand for dismissal of all claims for lack of subject matter jurisdiction.

¶ 2 In setting forth the facts leading to appellees' possession of W.C.K., the majority reads the record very differently than I do; and not, I would suggest, in accordance with our role as an appellate court in deferring to the trial court on matters of credibility. There is ample evidence that from the time of his birth until his placement with appellees, Mother failed to accept any responsibility for the care of W.C.K. In fact, if Kiefer, who clearly had *in loco parentis* status, had filed the petition for termination of Mother's rights pursuant to § 2511(a)(6), this record provides adequate grounds for granting that petition as against Mother. I strongly disagree with the majority that the "Guardianship Agreement" in this case was nothing more than a contract for baby-sitting. Rather, the clear language of the agreement evidences Mother's relinquishment of any responsibility for the care of her child whether "temporary" or not. My reading of the record indicates that Mother would have been content to leave W.C.K. with Kiefer indefinitely. The instances cited by the majority to support Mother's "attempts at reunification" more appropriately reflect feigned interest in W.C.K. at best.

¶ 3 I agree on the law that the order of the trial court must be reversed and custody returned to Mother. However, on the record before this court, I have grave concerns as to whether Mother is capable at the present time of caring for this child. Initially, Mother voluntarily relinquished custody of W.C.K. because she was either unable or refused to care for him, and to date, Mother has never been responsible for W.C.K.'s care. She has suffered from some type of depression[1] and substance abuse problems, and has uncertain living arrangements.[2] Therefore, rather than re-

---

1. This writer recognizes that serious and debilitating depression can occur for some women as a result of childbirth. This serious condition is well-documented. Therefore, if this was the basis of Mother's "depression," certainly evidence was available to support her contentions. Without such evidence, the trial court as fact-finder is free to disbelieve and disregard Mother's vague assessment of her medical condition as contributing to her inability to care for her child. The trial court looked to Mother's other activities during this same period such as working and socializing to counter her testimony of possible postpartum depression.

2. At the time of the hearing on September 29, 1998, Mother testified she was living in a one-bedroom apartment with her uncle and his two children. (Notes of testimony, 9/29/98 at 106.) Her stepmother testified that if W.C.K. were returned to Mother, that she and Mother's father would allow Mother to return to their home to live until she could get on her feet. (*Id.* at 110–111, 117.) This court is

turning this case to the trial court for dismissal of the petition for want of jurisdiction, I would remand this matter to Allegheny County, the residence of Mother. For the welfare and protection of W.C.K., I would further direct that Allegheny County Children & Youth Services ("CYS") monitor the transfer of W.C.K. from appellees to Mother. CYS should investigate and report to the family division of the Court of Common Pleas of Allegheny County as to whether Mother is capable of caring and providing for W.C.K. If necessary, CYS should make available to Mother any services which will further the interest of reunification.

¶ 4 On a final note, the parties to this appeal have ascribed various bad motives to the actions of each other and those of Kiefer and the trial court as well. I decline to so find. This is a case where there are clearly no winners. Assuming Mother is sincere in her desire to regain custody of her son, she is now a stranger to him. Considering appellees' fervor in pursuing this matter, they no doubt now truly love and cherish this young boy as their own. Additionally, the record reflects no bad motives on the part of Kiefer in doing what she clearly felt was in W.C.K.'s best interests; and contrary to Mother's allegations, I decline to find any bias, prejudice, or ill will demonstrated by the trial court's actions in this matter. My strongest concern must center on W.C.K. and the recognition that his young life will suffer yet another upheaval. Unlike the majority, I uncertain as to what Mother's current living

cannot place all the blame for this on the shoulders of the trial court and appellees. I believe Mother must shoulder her fair share, as well, for failing to even attempt to assume any parental responsibility for her child for the first four months of his life which set the scene for all that has since occurred. I only hope that W.C.K. has finally found a place to call home.

OLSZEWSKI, J., Concurring.

¶ 1 While I JOIN the majority's disposition of this case, I write separately to emphasize two points. First, I am not prepared to determine from the record before me that the DeCostros improperly expedited the adoption process. Second, I wish to express my discomfort with the result in this case. Our decision removes W.C.K. from a stable home and places him back in the care of Mother, who may or may not be unfit. While either Children and Youth Services or Kiefer may have had standing to pursue termination of Mother's parental rights, the DeCostros certainly did not. I am sympathetic to the DeCostros' attachment to W.C.K., but must insist that parties seeking termination follow the prescribed procedure. I therefore concur.