**In re ADOPTION OF B.R.S.**

**Appeal of S.C. and S.S.P.**

**In re Adoption of B.R.S.**

**Appeal of T.R.S.**

Superior Court of Pennsylvania.

Submitted Nov. 1, 2010.

Filed Jan. 18, 2011.

---

LaVieta Lerch, DuBois, for S.C.P. and S.S.P.

Kerith S. Taylor, Brookville, for appellee.

R. Edward Ferraro, Brockway, for Jefferson Co. Children & Youth, participating party.

Mark A. Wallisch, Brookville, for T.R.S., participating party.

BEFORE: BOWES, LAZARUS, and FREEDBERG, JJ.

OPINION BY BOWES, J.:

In this appeal and cross appeal, S.C. and S.S.P. ("Foster Parents") appeal from the orphans' court's order denying their petition to involuntarily terminate the parental rights of T.R.S. ("Father") to his daughter, B.R.S., pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a) and (b).[1] Father cross appeals the orphans' court's decision to deny his motion to quash Foster Parents' petition to involuntarily terminate his parental rights for a lack of standing. While the appeal and cross appeal were listed consecutively as separate appeals, we dispose of both appeals in a single adjudication since they arise from a common set of facts and are intertwined procedurally. Upon careful review, we sustain Father's challenge and dismiss Foster Parents' appeal.

When B.R.S. was born on March 8, 2008, Father and C.C.W. ("Mother") were incarcerated, and the child lacked an appropriate caregiver upon her release from the hospital. N.T., 3/18/08, at 2. Accordingly, Jefferson County Children and Youth Services ("CYS") placed B.R.S. in shelter care with Foster Parents, who were also caring for her half-sister.[2] Id. The juvenile court adjudicated B.R.S. dependent on April 23, 2008, and granted CYS legal custody. N.T., 4/23/08, at 13–14. The initial permanency goal was reunification. N.T., 10/22/08, at 9. The juvenile court directed both parents to complete parenting classes, mental health assessments, and drug and alcohol assessments. N.T., 4/23/08, at 14. Following the adjudication of dependency, the juvenile court returned B.R.S. to Foster Parents' physical care, where she remains. Id. at 14.

Over the following year, Father made little progress with the court-ordered goals; he sent his daughter letters and

---

1. The same order involuntarily terminated the birth mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (2). She did not appeal.

2. Foster Parents adopted B.R.S.'s half-sister on January 28, 2009.

completed mental health and drug and alcohol assessment, but failed to document his achievements. N.T., 10/22/08, at 8. Similarly, as a consequence of his imprisonment in SCI Camp Hill following an altercation in the Jefferson County Jail, Father was unable to complete the required parenting classes. N.T., 1/1/09, at 8, 10. While Father originally envisioned being paroled as early as January 2009, he remained incarcerated until his sentence expired on November 20, 2009. N.T., 10/22/08, at 11.

At three of the four permanency review hearings between October 22, 2008 and September 29, 2009, CYS petitioned the juvenile court to change B.R.S.'s permanency goal from reunification to adoption, and it consistently identified Foster Parents as prospective adoptive parents. B.R.S.'s guardian *ad litem* strongly agreed with the agency's request to change the permanency goal to adoption. However, the juvenile court was hesitant to change the permanency goal in light of the progress Father had begun to achieve. *See e.g.*, N.T., 1/1/09, at 15–16. Prior to the January 2009 permanency review hearing, Father documented his completion of the required drug and alcohol evaluation and mental health assessment. *Id.* at 8–9. He also maintained contact with CYS and continued to send his daughter correspondence. *Id.* at 5–6, 8. During the fall of 2009, the juvenile court changed B.R.S.'s permanency goal to adoption. N.T., 12/9/09, at 7. While CYS contemplated filing a petition to involuntarily terminate Father's parental rights pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a) and (b), it never did. *Id.* Instead, upon Father's release from incarceration in November 2009, CYS initiated biweekly two-hour supervised visitation. *Id.* at 6, 8, 10. It also referred Father for services such as additional drug and alcohol assessment and outpatient counseling, which Father completed. *Id.* at 6, 8. In fact, Father not only accomplished everything that CYS requested, but he also asked the agency to recommend additional things that he could do to improve his position. *Id.* at 8–9.

During the March 2010 permanency review hearing, CYS observed that Father continued to attend the supervised visitation on a consistent basis. N.T., 3/24/10, at 5–6. Father submitted to a bonding evaluation with B.R.S. during the supervised visitations. *Id.* at 6. The bonding evaluator, Allen H. Ryen, Ph.D., noted that visitation was appropriate and recommended that CYS progressively increase the visitation from biweekly periods of two-hour supervised visitation to weekly eight-hour periods of visitation. *Id.* at 6, 8. CYS noted its intention to increase Father's visitation with his daughter accordingly. *Id.* at 7, 9. Again, CYS indicated that Father had accomplished nearly everything the agency had requested of him. *Id.* at 9. Father completed the parenting classes that were not available to him at SCI Camp Hill, continued to attend outpatient counseling, and obtained employment. *Id.* at 6–7.

Nevertheless, despite Father's significant progress, CYS maintained that reunification with B.R.S. would be premature at that point. It believed that B.R.S.'s permanency goal should remain adoption, at least until Father began exercising unsupervised visitation with his daughter. *Id.* at 10, 11. The juvenile court concurred. *Id.* at 17. Accordingly, it maintained the permanency goal of adoption, scheduled a hearing to review the matter in three months, and approved the implementation of Dr. Ryen's progressive visitation regimen. *Id.* at 17–18.

Apparently dissatisfied with CYS's decision to forgo pursuing involuntary termination of Father's parental rights during

the March 24, 2010 permanency review hearing, Foster Parents informed the parties in open court that they had initiated the adoption process in the orphans' court[3] earlier that day by filing the prerequisite report of intention to adopt B.R.S.[4] *Id.* at 13. Foster Parents also challenged Dr. Ryen's bonding analysis and assailed aspects of his concomitant recommendations. *Id.* at 15–16.

On April 13, 2010, Foster Parents filed a petition for involuntary termination of Mother's and Father's parental rights. Father countered on May 24, 2010, with a motion to quash Foster Parents' petition because they lacked standing pursuant to 23 Pa.C.S. § 2512 to file a petition to involuntarily terminate his and Mother's parental rights. The orphans' court denied Father's motion and, following an evidentiary hearing on Foster Parents' petition, it entered the above-referenced order granting the petition for involuntary termination of Mother's parental rights and denying the petition as to Father. This appeal and cross appeal followed.

At the outset, we address Father's complaint that Foster Parents lacked standing to file a petition for involuntary termination of his parental rights. CYS and B.R.S.'s guardian *ad litem* filed a joint brief in support of Father's position.[5]

 Our standard of review is as follows:

The question of standing is whether a litigant is entitled to have the court decide the merits of the dispute or of particular issues. When a statute creates a cause of action and designates who may sue, the issue of standing becomes interwoven with that of subject matter jurisdiction. Standing then becomes a jurisdictional prerequisite to an action. Issues pertaining to jurisdiction are pure questions of law, and an appellate court's scope of review is plenary. Questions of law are subject to a *de novo* standard of review.

*In re B.L.J., Jr.*, 938 A.2d 1068, 1071 (Pa.Super.2007) (quotations and citations omitted). Pursuant to 23 Pa.C.S. § 2512(a)(3), an "individual having custody or standing *in loco parentis* to the child and who has filed a report of intention to adopt" may file a petition for the involuntary termination of parental rights. Case law has defined custody in this context as legal custody rather than physical custody. *In re C.M.S.* 884 A.2d 1284, 1288 n. 5 (Pa.Super.2005) (*citing In re Adoption of Re J.F.*, 392 Pa.Super. 39, 572 A.2d 223, 225 (1990) and *In re Adoption of Crystal D.R.*, 331 Pa.Super. 501, 480 A.2d 1146, 1148 (1984)). Thus, where, as here, the foster parents do not have legal custody or stand *in loco parentis,* they lack standing to file a petition to involuntarily terminate the birth parents' parental rights. *Id.*

3. Pursuant to the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.,* permanency planning for dependent children is conducted under the aegis of the juvenile court. Conversely, involuntary termination of parental rights is conducted under the jurisdiction of the orphans' court pursuant to the Adoption Act, 23 Pa.C.S. § 2101, *et seq.* In these cases, the same trial judge presided over both matters.

4. Section 2512(a)(3) of the Adoption Act requires third parties seeking to terminate a birth parent's parental rights to, *inter alia,* file a report of intention to adopt.

5. CYS and the guardian *ad litem* explained, "[t]he agency's position has always been and remains that [Father] has completed all required services and has established a bond with his child, and [it] is working to reunify the child with [Father]. The agency does not support the [Foster Parents] in their actions to terminate the parental rights of natural Father." Joint Brief of Guardian *ad litem* and CYS, at 6; *see also* N.T., 6/18/10, at 266–267.

In denying Father's motion to quash the third-party petition to terminate Father's parental rights, the orphans' court relied squarely upon our holding in *In re Griffin*, 456 Pa.Super. 440, 690 A.2d 1192 (1997), to invoke the so-called "prospective adoptive parent exception" to the general rule that foster parents lacked standing to litigate matters involving their foster children, and Foster Parents level the identical argument on appeal. *See* Trial Court Opinion, 8/16/10, at 12, 14. However, for the following reasons, we do not believe the *Griffin* exception applies under the facts of the instant case.

Unlike the case *sub judice*, which involves whether Foster Parents fit within the statutorily-defined standing requirements to file a petition for involuntary termination of parental rights pursuant to the Adoption Act, *Griffin* addressed whether dissatisfied foster parents had standing to appeal a juvenile court's decision to remove a dependent child from their care. In upholding the foster parents' standing to appeal from the juvenile court order, the *Griffin* court reasoned that as the designated prospective adoptive parents, they had an expectation of permanent custody that grants them standing in dependency and custody matters involving the foster child. The *Griffin* court offered the following rationale:

> [P]rospective adoptive parents, unlike foster parents, have an expectation of permanent custody which, though it may be contingent upon the agency's ultimate approval, is nevertheless genuine and reasonable. Because of this expectation of permanency, prospective adoptive parents are encouraged to form emotional bonds with the child from the first day of the placement. By removing the child from the care of the prospective adoptive parents, the agency forecloses the possibility of adoption. In light of the expectation of permanent custody that attends an adoptive placement, an agency's decision to remove a child constitutes a direct and substantial injury to prospective adoptive parents. Because prospective adoptive parents, unlike foster parents, suffer a direct and substantial injury when an agency removes a child from them, we see no reason in law or policy whey we should limit their standing to sue for custody.

*Id.* at 1201 (quoting *Mitch v. Bucks County Children and Youth Social Service Agency*, 383 Pa.Super. 42, 556 A.2d 419, 423 (1989) (prospective adoptive parents have standing in juvenile court to contest agency's decision to remove foster child from their physical custody)).

Herein, the certified record supports the orphans' court's finding that Foster Parents assumed the designation of prospective adoptive parents during the dependency proceedings. However, the standing issue in this case does not involve a challenge to CYS's decision to remove the child from their care. Indeed, nothing in the certified record even suggests that CYS has contemplated removing B.R.S. from Foster Parents' care. Instead, the case at bar concerns whether Foster Parents possess legal custody of B.R.S. or stand *in loco parentis*. *See* 23 Pa.C.S. § 2512(a)(3). Accordingly, we find the orphans' court's reliance upon the so-called prospective adoptive parents exception that we outlined in *Griffin* is inapposite.

As noted *supra*, under established case law, Foster Parents do not fit within either class of third parties that qualify to file a petition to terminate the parental rights of a birth parent. First, it is beyond cavil that Foster Parents lack legal custody of B.R.S., which inarguably rests with CYS. Likewise, as discussed *infra*, Foster Parents have not attained *in loco parentis* status.

In *In re B.L.J., Jr., supra* at 1073 (quoting *In re Adoption of J.M.E.,* 416 Pa.Super. 110, 610 A.2d 995, 997 (1992)), we explained, "the legal status of *in loco parentis* refers to a person who puts himself or herself 'in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption.'" We further elucidated that there are two aspects of *in loco parentis:* "assumption of parental status and discharge of parental duties. In order for assumption of parental duties to be legitimate, ... [it] must be predicated on the natural parent's agreement to a permanent placement of the child." *Id. (quoting In re C.M.S.,* 884 A.2d 1284, 1288 (Pa.Super.2005)).

The certified record confirms that Foster Parents responsibly discharged their parental duties to B.R.S. since her birth. Nevertheless, Foster Parents cannot establish *in loco parentis* status because Father never agreed to the permanent placement of B.R.S. with either CYS or, more importantly, Foster Parents themselves. Although Father was responsible for creating the circumstances that led to his imprisonment, CYS's involvement with his family, and his daughter's placement with the Foster Parents, he never agreed to relinquish his parental role. Indeed, Father maintained contact with both CYS and Foster Parents during his entire incarceration, even accomplishing certain objectives the agency requested while jailed. Although Father's movement toward reunification with B.R.S. was minimal while in prison, upon his release, Father's progress was momentous. His success was substantiated in the record by CYS, the guardian *ad litem,* and the juvenile court during the latter permanency review hearings and was further evidenced by Dr. Ryen's recommendation for progressively increased visitation. Accordingly, the evidence does not permit a finding that Father agreed to the permanent placement of B.R.S. with CYS or Foster Parents for the purpose of determining whether Foster Parents, albeit prospective adoptive foster parents, stood *in loco parentis* to the child. *See In re Adoption of W.C.K.,* 748 A.2d 223, 230 (Pa.Super.2000) (insufficient evidence of agreement for permanent placement to establish element of *in loco parentis* status). Furthermore, the fact that Foster Parents subjectively intended to adopt B.R.S. when they first assumed their parental roles has no legal significance. *Id.* at 231 ("The intentions of the [foster parents] are of absolutely no moment where the natural [parent] has not consented to the adoption and more importantly, has not even expressed a desire to permanently place the child with another party.")

Moreover, Foster Parents' reliance upon *In re B.L.J., Jr., supra,* in support of their position that they attained *in loco parentis* status because they have been B.R.S.'s custodial caregivers since the child's birth and were recognized by CYS as prospective adoptive parents is unavailing. In *In re B.L.J., Jr.,* we addressed whether prospective foster parents stood *in loco parentis* to a child for the purpose of § 2512. We found that the natural mother had expressed no desire to care for the child, and the child's grandmother, who had previously attained *in loco parentis* status, initiated the termination proceedings properly under § 2512, and expressly permitted prospective adoptive parents to join the termination petition. *See id.* at 1073. The grandmother died two days after filing the petition to terminate and the orphans' court granted the prospective adoptive parents temporary custody of the child. *Id.* at 1070. Thereafter, Mother filed preliminary objections to the termination petition. Mother cited several

grounds for the preliminary objections, including the prospective adoptive parents' lack of standing, but the crux of Mother's objection was that she wanted the child to live with someone else. *Id.* at 1073.

In resolving the standing issue, we reasoned that the grandmother's standing *in loco parentis* established in her a right to petition to terminate the mother's parental rights pursuant to 23 Pa.C.S. § 2512 and to seek out the prospective adoptive parents to file the joint termination petition. *Id.* at 1073–1074. Accordingly, we reversed the orphans' court order sustaining the natural mother's preliminary objection to the joint petition and concluded that under the particular circumstances of that case, the orphans' court "should substitute [the prospective adoptive parents] for [the g]randmother as third parties with *in loco parentis* status for the purpose of proceeding with the termination petition." *Id.* at 1074.

The facts underlying *In re B.L.J., Jr.* are readily distinguishable from the instant case. Primarily, we observe that Father herein did not acquiesce to the permanent placement of his daughter, and unlike the prospective foster parents in *In re B.L.J., Jr.*, no one with parental rights conferred *in loco parentis* status upon Foster Parents. Hence, the only similarity between the two cases is that both sets of foster parents have been designated as prospective adoptive parents. However, as CYS accurately observed, this designation alone does not grant standing pursuant to § 2512 to file a petition to terminate Father's parental rights.

Foster Parents' reliance upon *In re B.L.J., Jr.* focuses upon our recognition that, in light of the grandmother's death and the prospective adoptive parents' status as the caretakers she appointed to provide permanently for the child, the prospective adoptive parents had a substantial interest in the child's welfare. *Id.* at 1073–1074. Significantly, however, unlike the caretakers in *In re B.L.J., Jr.*, Foster Parents did not have a reasonable expectation of permanency and were not granted permanent custody by a person standing *in loco parentis*. Herein, CYS placed B.R.S. in Foster Parents' physical custody pending resolution of the juvenile proceedings. When it initially appeared that Mother and Father would be unable to assume their parental responsibilities, CYS designated Foster Parents as prospective adoptive parents if the need to terminate Mother's and Father's parental rights arose. However, when Father demonstrated significant progress toward reunification, the juvenile proceedings were extended. Thus, while Foster Parents are doubtlessly interested in B.R.S.'s welfare, they did not possess the substantial interest of permanency that we envisioned in *In re B.L.J., Jr.*

■ Next, we observe that Foster Parents' attempt to invoke the Resource Family and Adoption Process Act, 11 P.S. §§ 2621–2625, for the proposition that foster parents have standing "to file for adoption of children for whom they have cared" is untenable. While the Resource Family and Adoption Process Act recognizes foster parents' service to children within the foster care system and seeks to ensure that foster parents are treated equitably during foster care proceedings, the sparse provisions of that statute cannot reasonably be read to provide foster parents standing to file a petition to terminate the birth parents' parental rights. In fact, the statute does not convey any legal rights to foster parents beyond an adoption interview with the appropriate agency after certain enumerated events occur. *See* 11

P.S. § 2624.[6] Foster Parents' attempt to contort that limited provision to provide them with standing fails.

■ Likewise, Foster Parents' reliance upon the Adoption and Safe Families Act of 1997 (ASFA), 42 U.S.C. § 671–675, is also misguided. ASFA imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. The amendments to the Juvenile Act, 42 Pa. C.S. § 6301, *et seq.*, provide that a court shall determine certain matters at the permanency hearing, including whether the child has been placed into foster care for fifteen out of the last twenty-two months. *See* 42 Pa.C.S. § 6351(f)(9); *In re R.J.T.*, —— Pa. ——, 9 A.3d 1179, 1186 (Pa.2010). With regard to permanency planning, following reasonable efforts to reestablish the biological relationship, the process of the agency working with foster care institutions to terminate parental rights should be completed within eighteen months. *See In re N.W.*, 859 A.2d 501, 508 (Pa.Super.2004). While ASFA directs the state agency to initiate proceedings to terminate parental rights where a child has been in foster care for fifteen of the most recent twenty-two months, that statute does not create a private right of action for foster parents to pursue adoption or to file a petition for involuntary termination in contravention of the eligibility requirements defined in the Adoption Act. In fact, ASFA provides for situations where, as here, the agency has found compelling reasons to forgo the time requirements since filing the petition would not be in the child's best interest. *See* 42 U.S.C. § 675(5)(E)(ii). Thus, this claim also fails.

For all of the foregoing reasons, we reverse the orphans' court's order denying Father's motion to quash Foster Parents' third-party petition to involuntarily terminate his parental rights as lacking standing under 23 Pa.C.S. § 2512, and we dismiss Foster Parents' appeal. *See In re Adoption of W.C.K., supra*, at 228 ("When a statute creates a cause of action and designates who may sue, the issue of standing becomes interwoven with that of subject matter jurisdiction. Standing then becomes a jurisdictional prerequisite to an action.") As we are constrained to dismiss Foster Parents' appeal, we do not address the merits of their argument that the or-

---

**6.** Section 2624, regarding the resource family adoption interview process, provides as follows:

(a) **Interview.**—A resource family parent or parents shall be given an interview with the appropriate county or private agency when all of the following occur:

(1) The county or private agency that placed the child with that resource family has changed the child's goal from foster care to adoption.

(2) The resource family parent is interested in becoming an adoptive resource for that child.

(3) The child has resided with that resource family for six months or more.

(b) **Resource family parent interview.**—In addition to information obtained from interviews of other prospective adoptive families, the interviewing agency shall convey information obtained from the interview with the resource family parent to the county agency responsible for making the determination as to adoptive placement of the child.

(c) **Consideration of more than one adoptive resource.**—When more than one adoptive resource is available for the placement of a child, the county agency shall document its reasons for placing the child with the selected adoptive parents in the child's case record.

(d) **Certain concerns not to be considered.**—No resource parent who meets the conditions set forth in subsection (a) shall be denied consideration as an adoptive parent solely because of the inability to access that individual as a resource family parent in the future.

phans' court erred in denying the petition to terminate Father's parental rights.

Order reversed. Appeal listed at 1210 WDA 2010 dismissed. Jurisdiction relinquished.