J-S02032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: R.C.-E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 931 EDA 2017 |

Appeal from the Order February 21, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0002538-2015

| IN THE INTEREST OF: G.C.-E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 932 EDA 2017 |

Appeal from the Order February 21, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0002539-2015

| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 933 EDA 2017 |

Appeal from the Order February 21, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0001077-2013

| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|

J-S02032-18

APPEAL OF: J.C., MOTHER

:
:
:
:
:
:
:
:
: No. 1033 EDA 2017

Appeal from the Order February 21, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0001077-2013

| IN THE INTEREST OF: R.C.-E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|

APPEAL OF: J.C., MOTHER

:
:
:
:
:
:
:
:
: No. 1034 EDA 2017

Appeal from the Order February 21, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002538-2015

| IN THE INTEREST OF: G.C.-E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|

APPEAL OF: J.C., MOTHER

:
:
:
:
:
:
:
:
: No. 1035 EDA 2017

Appeal from the Order February 21, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002539-2015

BEFORE:    BOWES, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY BOWES, J.:

**FILED JULY 25, 2018**

_____

*   Retired Senior Judge assigned to the Superior Court.

J.C. ("Mother") appeals the orders entered on February 21, 2017, wherein the juvenile court denied her request to remove her three children, A.M., R.C.-E., and G.C.-E., from foster care and place them with L.F. ("Grandmother").[1] The orders also denied Mother's request for the juvenile court to recuse itself from future dependency proceedings involving this family. We quash the appeals docketed at 1033, 1034, and 1035 EDA 2017, and affirm the orders that are the genesis of the appeals docketed at 931, 932, and 933 EDA 2017.

A.M., R.C.-E., and G.C.-E. were born during 2004, 2012, and 2013, respectively. In October 2015, the children were adjudicated dependent, and the Philadelphia Department of Human Services ("DHS") placed them in foster care. Since May 2016, all three children have resided together in their current foster home, which is a pre-adoptive resource. Mother and Grandmother each were granted supervised visitation. While Grandmother was not a party, she attended the dependency hearings. DHS previously explored Grandmother for kinship placement, but it ultimately determined that her housing was not appropriate. Mother disputed the agency's decision, but the juvenile court declined to provide immediate relief. Instead, it held the matter in abeyance and continued argument over the following two permanency review hearings.

---

[1] The court entered a separate order for each child. Other than the captions and identifying information, the three orders are identical.

On February 21, 2017, the juvenile court held a permanency review hearing that addressed, *inter alia*, 1) Grandmother's petition to intervene formally in the dependency proceedings; and 2) Mother's petition to place the three children with Grandmother. The court ultimately deemed Mother's entreaty as a request for judicial removal of the children from their pre-adoptive foster home. During the ensuing proceeding, Mother proffered several requests for the juvenile court judge to recuse himself. The recusal requests were denied, and at the close of the evidentiary proceeding, the juvenile court denied Mother's motion to remove the children from their pre-adoptive foster care.[2] Additionally, the court excluded Grandmother from attending the children's future appointments. In pertinent part, the juvenile court directed,

> THE COURT FURTHER ORDERS: Maternal Grandmother's motion to intervene, and Mother's . . . request of judge recusal are denied. Judicial removal denied. Maternal grandmother is not allowed to attend child's appointments. Child to remain as committed. Next court date must be tried contested goal change [and] termination [of Mother's parental rights].
>
> . . . .
>
> Such disposition having been determined to be best suited to the protection and physical, mental and moral welfare of the child.

---

[2] The juvenile court also denied Grandmother's petition to intervene. In a separate, consecutively-listed appeal to this Court, the instant panel reviewed the merits of the juvenile court's determination and affirmed the February 21, 2017 permanency review order denying her request to intervene in the dependency proceedings. ***In re A.M.***, 2018 WL 1979123 (unpublished memorandum filed April 27, 2018).

Permanency Review Order, 2/21/17, at 2.

On March 17, 2017, Mother filed timely notices of appeal from the permanency review orders, wherein she challenged "the appropriateness of the [children's] permanency plan" generally. Notice of Appeal, 3/17/17. The concomitantly filed Pa.R.A.P. 1925(b) statement raised issues relating to, *inter alia*, the denial of her request to remove the children from their current foster home and Grandmother's exclusion from the children's appointments. On March 23, 2017, we docketed Mother's appeals consecutively at 931, 932, and 933, EDA 2017.

On the same date that we docketed the foregoing appeals, the thirtieth day of the appeal period, Mother filed in the juvenile court three additional notices of appeal referencing only the portion of the February 21, 2017 permanency review order that denied her requests for recusal. We listed those appeals on the docket at 1033, 1034, and 1035 EDA 2017, and consolidated all six appeals for disposition.

Mother presents the following questions for review:

1. Whether the lower court committed an error of law and abuse of discretion in denying Mother['s]request for a permanency hearing pursuant to 42 Pa.C.S. § 6351 (e).

2. Whether the lower court committed an error of law and abuse of discretion in establishing and/or maintaining a concurrent plan for adoption without a hearing pursuant to 42 Pa.C.S. § 6351 (e). ***See also***, ***Interest of Z.V.***, ___ A.3d ___ (Pa. Super. March 23, 2017).

3. Whether the lower court committed an error of law and abuse of discretion by ordering Mother to prosecute a "Judicial Removal" hearing in lieu of a permanency hearing.

4. Whether the lower court committed an abuse of discretion by forbidding Maternal Grandmother, without cause, from continuing to attend the children's appointments for medical and special services.

5. Whether the lower court committed an error of law and abuse of discretion in denying Mother['s]request for Recusal under Rule 2.11 of the Pennsylvania Code of Judicial Conduct, on the basis that the Court should disqualify himself from further proceedings in this matter because his impartiality might reasonably be questioned.

6. Whether the lower court erred denying Mothers request for Recusal because of the appearance of bias and/or ill [will].

7. Whether the Superior Court should decline to consider the "Factual and Procedural History" contained in the lower court opinion because it is dependent upon statements not in evidence below.

Mother's brief at 4.

We review the juvenile court orders for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). "[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *Id*.

At the outset, we discuss the procedural posture of these overlapping appeals. First, as it relates to Mother's second, superfluous appeal challenging only the trial court's denial of her requests for recusal, those appeals should

be quashed. Since the only appealable juvenile court docket entries in these cases were the February 17, 2017 permanency review orders, which Mother timely appealed at 931, 932 and 933 EDA 2017, the subsequent appeals listed at 1033, 1034, and 1035 EDA 2017 are redundant. Thus, we are obligated to quash those appeals. *See*, *e.g.*, *Neidert v. Charlie*, 143 A.3d 384, 387 n.3 (Pa.Super. 2016) (summarily disposing premature and duplicative appeal); *Gates v. Gates*, 967 A.2d 1024, 1026 n.1 (Pa.Super. 2009) ("We quash the appeal listed on our docket at 1026 WDA 2008 because it is duplicative of the appeal Mother filed at 1023 WDA 2008."); *Corbett v. Weisband*, 551 A.2d 1059 (Pa.Super. 1988) (quashing one of two appeals filed from same judgment entered in favor of same defendant).

Moreover, assuming *arguendo* that Mother's first timely appeal subsumed her subsequent claim that the juvenile court erred in denying her various requests for the juvenile court judge to recuse from the dependency proceedings, we could not address that argument herein because issues relating to the denial of a motion to recuse are interlocutory. *See Haviland v. Kline & Specter, P.C.*, 2018 PA Super 67 (March 22, 2018) (discussing settled principle that order denying motion to recuse judge from further proceedings is interlocutory). Mother's instant challenges to the trial court's decision to deny her entreaties to recuse are premature appeals that are neither appealable as of right under Pa.R.A.P. 311 nor collateral orders under Pa.R.A.P. 313. Accordingly, for both of the foregoing reasons, the appeals

docketed at 1033, 1034, and 1035 EDA 2017 must be quashed. Hence, we do not address the merits of the fifth and sixth issues leveled in Mother's statement of questions involved.

The merits of the remaining appeals are reviewable. In **H.S.W.C.-B.**, our Supreme Court addressed the finality of permanency review orders and concluded that dependency orders granting or denying status changes are considered final when entered, even though the dependency proceedings continue to progress. The pertinent facts of that case follow. The juvenile court denied the petition filed by Child and Youth Services ("CYS") to change the permanency goals of two children from reunification to adoption. We quashed CYS's ensuing appeal because the permanency review order was an interlocutory order that merely maintained the *status quo*. The High Court reversed, reasoning, "[m]aintaining the *status quo* could put the needs and welfare of a child at risk." **Id**. at 910. It further developed, "the denial of goal changes which are in the best interest of the child should not be sheltered, permanently, from independent review[.]" **Id**.

As it relates to the salient issue in the case at bar, the High Court continued, "[f]oster care may be the *status quo*, but to allow these children to languish in foster care not only defies common sense, but it is contradictory to the applicable law and to the best interest of the children. . . . Without appellate review, [a] scenario [where children grow up in an indefinite state of limbo] could be perpetuated, denying children much-needed permanency."

- 8 -

*Id* at 910-11 (internal quotation marks and citation omitted). Hence, the Court concluded that, although the order denying CYS's request for a goal change maintained the *status quo* for the children in foster care, "an order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered." *Id*. at 911. Thus, the High Court reversed our decision to quash the appeal.

Recently, in *In Interest of N.M.*, 2018 PA Super 119 (filed May 4, 2018), this Court confronted the appealability of a juvenile court order that denied the parents' request to change their child's placement from foster care to kinship care with the paternal grandmother. In *dicta*, the *N.M.* Court cabined the application of *H.S.W.C.-B.* to goal change orders and purported to exclude from its scope orders altering foster placement. After quoting the relevant portion of the Supreme Court's discussion in *H.S.W.C.-B.*, the *N.M.* Court simply stated, "[u]nlike the mother in *H.S.W.C.–B.*, who requested a goal change, Parents here requested a placement change—from foster care to kinship care. Thus, we do not find *H.S.W.C.–B.* controlling." *N.M.*, *supra* at * 7.[3]

_____

[3] We observe that the *N.M.* Court omitted from its discussion any considerations regarding the risk of harm associated with failing to confront the order on appeal without delay, and it neglected to provide a cogent explanation regarding why an order relating to a child's safety in foster placement should be viewed differently from an order granting or denying a goal change when both orders affect the *status quo*. As set forth in *H.S.W.C.-B.*, a dependency order is immediately reviewable if waiting for the entry of a

Significantly, however, notwithstanding its discussion of **H.S.W.C.-B.**, the **N.M.** Court proceeded to the merits of the order denying the parents' placement request and affirmed it. We reasoned that, since this Court had consolidated the parent's initial appeal with their subsequent appeal from the goal change order, it could review the orders collectively.[4] Thus, the **N.M.** Court's brief analysis of our Supreme Court's holding in **H.S.W.C.-B.** is *dicta* insofar as it was not essential to its ultimate decision to uphold the merits of the order declining to alter the child's foster placement. As our High Court reiterated, "dicta is an opinion by a court on a question that is directly

---

final order will cause a child to languish in a potentially unsafe condition. The **N.M.** Court's analysis ignores this reality. More importantly, it espouses a distinction between goal change orders and placement orders without engaging in even a superficial inquiry regarding the effect of maintaining the *status quo* on the child's best interest, which is the paramount consideration in dependency proceedings.

[4] The **N.M.** Court's discussion concerning the reviewability of interlocutory dependency orders was inaccurate insofar as it referenced the termination of parental rights, rather than the goal change order, as the cornerstone of what it styled as the "permanency appeals." The Court plainly conflated goal change orders with decrees terminating parental rights. As we have previously explained, goal change proceedings under the Juvenile Act and the involuntary termination of parental rights under the Adoption Act are distinct actions asserted under the authority of different statutes and argued in different divisions of the Court of Common Pleas. **In re Adoption of B.R.S**., 11 A.3d 541, 545 n.3 (Pa.Super. 2011). Thus, dependency matters are not incorporated into termination of parental rights appeals by design, and this Court does not mechanically review a dependency record as part of an appeal from the termination of parental rights. Indeed, unless a concomitant goal change order is specifically appealed and consolidated with the termination of parental rights appeal, we do not address dependency matters in termination of parental rights cases.

- 10 -

involved, briefed, and argued by counsel, and even passed on by the court, **but that is not essential to the decision**." ***Castellani v. Scranton Times, L.P.***, 124 A.3d 1229, 1243 n.11 (Pa. 2015) (emphasis added) (quoting ***Valley Twp. v. City of Coatesville***, 894 A.2d 885, 889 (Pa.Cmwlth. 2006)). As *dicta* has no precedential value, we are not bound the **N.M.** Court's brief rationale. ***Id***. Accordingly, pursuant to **H.S.W.C.-B.**, we review the merits of Mother's remaining arguments that challenge (1) the manner that the juvenile court conducted the February 2017 hearing; and (2) the court's decision to maintain the *status quo* with respect to the children's foster placement.

We address collectively the first, third, and fourth issues that Mother raised in her questions presented for review, and after a thorough review of the certified record, the parties' briefs and the pertinent law, we affirm the February 21, 2017 orders on the basis of the cogent and well-reasoned opinion entered on May 24, 2017, by the distinguished Judge Joseph Fernandes. Specifically, the certified record supports the juvenile court's conclusion that "[t]he court heard testimonial evidence that overwhelmingly supported that the Children should not be removed from the care of the foster family." Trial Court Opinion, 5/24/17, at 11. Similarly, the record supports the juvenile court's determination that precluding Grandmother from attending the children's appointments in Mother's stead promotes the children's best interest. ***See id***. at 12 ("In order to ensure that Mother took responsibility

for attending the Children's appointments, [Grandmother] was ordered not to attend any further appointments for the Children.").

Mother's final issue relates to the juvenile court's recitation of fact in the "Factual and Procedure Background" section of the Rule 1925(a) opinion. As this issue necessarily was omitted from the Rule 1925(b) statement that Mother filed concomitant with the notices of appeal, it is unreasonable to find the argument waived in these circumstances. Nevertheless, Mother's complaint is unavailing. Stated plainly, regardless of any purported deficiencies with the juvenile court's recitation of the factual and procedural histories, our review of the certified record confirms that the evidence supports the court's decision to deny Mother's request to alter the children's foster placement. Thus, we do not disturb the orders denying the requested relief.

Thus, for all of the foregoing reasons, we quash the appeals listed at 1033, 1034, and 1035 EDA 2017, review the merits of the issues that relate to the appeals docketed at 931, 932, and 933 EDA 2017, and affirm the juvenile court's orders based upon Judge Fernandes's comprehensive opinion entered in these cases on May 24, 2017.

Orders affirmed.

Judge Nichols concurs in the result.

Judge Ransom did not participate in the consideration or decision of this case.

- 12 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/25/18

Filed 8/28/2017 11:48:38 PM Superior Court Eastern District
931 EDA 2017

**IN THE COURT OF COMMON PLEAS**
**FOR THE COUNTY OF PHILADELPHIA**
**FAMILY COURT DIVISION**

| | | |
|---|---|---|
| In the Interest of R. C.-E., a minor | : | CP-51-DP-0002538-2015 |
| | : | |
| In the Interest of G. C.-E., a minor | : | CP-51-DP-0002539-2015 |
| | : | |
| In the Interest of A. M., a minor | : | CP-51-DP-0001077-2013 |
| | : | |
| | : | 51-FN-002084-2013 |
| | : | |
| APPEAL of: J.C., Mother | : | 931/932/933 EDA 2017 |

**OPINION**

**Fernandes, J.:**

Appellant J.C. ("Mother") appeals from the order entered on February 21, 2017, denying Mother's request for a judicial removal in regards to A. M. ("Child 1"), R. C.-E. ("Child 2"), and G. C.-E. ("Child 3") (collectively "Children") pursuant to 42 Pa. C. S. A. §6351(e). Maureen Pié, Esq., counsel for Mother, filed a timely Notice of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b). Mother's counsel also filed a separate Notice of Appeal for the same order with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b) in which Mother appeals the trial court's denial of Mother's request for Court Recusal.[1]

**Factual and Procedural Background:**

This family became known to DHS in May 2013 due to concerns for the safety and welfare of the Children's sibling ("Sibling"). DHS received allegations that the Child 2's father ("Father") was physically abusive to Child 1, Child 2, and Sibling. DHS learned that Sibling, who suffered from a brain tumor, had sustained bruises on her chest and there were concerns that she was physically abused. Sibling was admitted to the hospital due to her illness on May 22,

---

[1] Mother's second appeal should be quashed or consolidated. Under Pa. R. A. P. §1925, a statement of errors complained of on appeal shall be filed concomitantly with the notice of appeal addressing complained of errors in the trial court's order. Mother's counsel filed two separate Notices of Appeal and Statements of Matters Complained of on Appeal for each child from the same order. Therefore, the matters complained of on the second Notice of Appeal and Statements of Matters Complained of on Appeal for each child should be quashed.

2013. On May 23, 2013, Child 2 was admitted to the hospital after his x-rays revealed that he had sustained one to three possible acute rib fractures. The Children's mother ("Mother") indicated that she did not know how Child 2 was injured but believed that his injuries may have been caused by a hyperactive twelve-year-old neighbor. Father denied blackening Child 1's eye in the past. Neither Mother nor Father could explain Child 2's rib fractures or Sibling's bruises. DHS learned that Child 1 was truant; she had thirty-six unexcused absences and seven late arrivals during the 2012-2013 school year, and sixty-four unexcused absences and nine late arrivals during the 2011-2012 school year. DHS also learned that Mother suffered from bipolar disorder, but was not taking her medication due to her pregnancy with Child 3. DHS received allegations that Mother and Father used marijuana. On May 23, 2013, DHS obtained an Order for Protective Custody ("OPC") for Child 1 and she was placed in foster care through Episcopal Community Services. On May 24, 2013, a shelter care hearing was held for Child 1 at which the OPC was lifted and temporary commitment to DHS was ordered to stand. On July 2, 2013, Child 1 was adjudicated dependent, the temporary commitment was discharged, and DHS was ordered to supervise Child 1's care after reunification with Mother. The court also ordered that Mother be referred to the Behavioral Health System ("BHS") for an evaluation and consultation; that DHS conduct home visits twice a week; that Mother comply with all services; that Mother permit the child advocate to enter the home; and that Functional Family Therapy ("FFT") be implemented in Mother's home forthwith. On September 30, 2013, Child 3 was born and Mother named Father as Child 3's father. On December 9, 2013, the court discharged DHS supervisions and the dependent petition for Child 1. On June 16, 2014, DHS received a General Protective Services ("GPS") report alleging that on June 9, 2014, Child 1 was found in Center City, Philadelphia; that Child 1 was wandering and crying; that Child 1 did not know her address or telephone number; that Child 1 could only provide the name of her school; that Child 1 was transported to her school by police; and that the police had obtained Child 1's home address. Mother was contacted by the school at the end of the day. When questioned, Mother claimed she thought Child 1 was on the school bus that morning. Child 1 was returned to Mother's care in September 2013. Child 1 was diagnosed with a learning disability, was enrolled in special education classes, and had an Individualized Education Plan ("IEP"). Child 1 also had a history of memory retention problems. Mother failed to ensure that Child 1 was safe on the

school bus and that she arrived safely. The report was found to be valid. On June 21, 2014, DHS learned that Sibling had stage four brain cancer and was receiving bi-monthly oncology treatments. Mother also informed DHS that the Children had not seen their primary care physician in about a year. On September 3, 2014, DHS filed dependent petitions for Child 1 and Sibling due to concerns for their safety and welfare. On October 15, 2014, an adjudicatory hearing was held for Child 1 and Sibling; Child 1 and Sibling were adjudicated dependent and DHS was ordered to supervise their care. The court also ordered that DHS or the assigned Community Umbrella Agency ("CUA") explore parenting classes for Mother; that CUA explore appropriate in-home services for Children and Sibling; that Mother ensure that the Children and Sibling attend all medical appointments; and that Mother be referred to BHS for consultation and evaluation. On November 5, 2014, the CUA Asociación Puertorriqueños en Marcha ("APM") visited Mother's home and learned that Child 1 was enrolled in a fourth grade special education class, was diagnosed with autism, and that she received speech therapy and life skills services at school. Mother also notified APM that she attended mobile family therapy; that she had issues regarding her housing and landlord; and that she had a bed bug infestation. APM and DHS attempted to visit Mother's home from December 2, 2014, to February 18, 2015, but Mother refused to allow them to enter the home. On February 25, 2015, APM visited Mother's home and observed stains on the walls from the extermination, carpet/rug residue on the floors, and other repair projects in progress. Mother informed APM that she was not paying rent and intended to relocate. That same day, the initial CUA Single Case Plan ("SCP") was developed. The goal for the Children was to remain in the home. CUA noted that the Children were at risk of removal and placement absent effective preventative services. Mother's SCP objectives were to comply with CUA services; to cooperate with all parties involved with her case; to continue services with the Child Guidance Family First Program; to stabilize her mental health issues; to continue to receive therapy, comply with all recommendations of her therapists, and participate in a scheduled mental health evaluation; to continue with all mental health services with the Family First Program; to stabilize her children's health issues; to ensure that all medical appointments for all of her children were kept; and to ensure that Sibling's special needs were met. On March 30, 2015, APM visited Mother's home and observed that Child 1 had two red marks on her face and one on her head which seemed to have scarring

or bruising around the mark. On June 10, 2015, Child 1 was reunited with Mother and the dependent petition was discharged. On August 26, 2015, DHS received a GPS report alleging that Mother, Children, and Sibling were evicted from their home; that the family had temporarily resided at an extended stay hotel and that Family-Based Services had obtained a storage locker for Mother's possessions and paid the hotel bill through September 2, 2015; that Mother's housing plan was not established; that Sibling was gravely ill and receiving daily treatment at the Children's Hospital of Philadelphia ("CHOP"); that Sibling used a wheelchair and was extremely weak; Sibling slept and ate often due to her medication; that Mother was resistant to signing consent forms, residing in a shelter, and utilizing parenting skills and Early Intervention services for Child 2 and Child 3; and that Sibling would likely be unable to reside in the shelter due to her compromised immune system. The report alleged that Mother received her income on the first day of every month; that Mother indicated that she was able to obtain housing; that Mother recently lost her housing due to a fraudulent landlord and lost $2400 on August 5, 2015; and that Mother refused to enter a shelter because Children and Sibling's grandmother was unable to move with the family. The report also alleged that Child 1 was diagnosed with autism; that Child 2 and Child 3 had undiagnosed developmental delays; that Children and Sibling had prior exposure to lead; that Mother had a history of mental health issues; that Mother received Supplemental Security Income ("SSI") benefits for Sibling; that Child 1's application for benefits was incomplete; that Father was abusive towards the Children and Sibling; and that Mother had prior evictions which prevented her from obtaining suitable housing. The report was found to be valid. On August 26, 2015, DHS visited Mother, Children, and Sibling at the hotel and offered to pay for the family to reside there for two more weeks, but Mother refused. Mother agreed to obtain a housing application from the Office of Supportive Housing ("OSH"). On August 27, 2015, DHS contacted Mother, who informed them that she and all the children were residing at a friend's home. DHS visited the house on the next day and determined that the home was appropriate for the care of the children. On September 11, 2015, DHS learned that Mother had been evicted from the friend's home after an argument, but Children and Sibling remained in the care of the friend. DHS also visited Mother's home and determined that her home was not appropriate for the Children and Sibling; Mother admitted that she had not gone for the application from OSH. On September 14, 2015, the friend contacted

DHS and stated she was unwilling to allow the children to continue their residence in her home. On September 15, 2015, DHS obtained OPC's for the Children and Sibling. Sibling was admitted to CHOP and the Children were placed in foster care through APM. At a shelter care hearing held on September 16, 2015, the court lifted the OPC and ordered the temporary commitment to stand. The court further ordered that Mother be referred to the Achieving Reunification Center ("ARC") for housing; that Mother be referred to the Clinical Evaluation Unit ("CEU") for a drug screen and assessment with dual diagnosis consideration; that Mother may have supervised visits with the Children at the agency; that the terms of Mother's visits could be modified by agreements of the parties; and that Mother sign any paperwork needed to assist DHS in planning and caring for the Children. Mother tested positive for marijuana on September 16, 2015. That same day, an initial SCP was developed and Mother's objectives were to obtain appropriate housing for the family; to comply with a referral to ARC; to cooperate with CUA services, including visits, communication, signing documents, etc.; to receive mental health treatment; and to submit to a mental health evaluation and comply with treatment and recommendations. On October 1, 2015, Child 1 was adjudicated dependent for the second time, while Child 2 and Child 3's dependent matters were continued and their temporary commitment was ordered to stand. The court ordered that Mother was permitted to have two-hour supervised visits with the Children, twice per week at the agency; that visits were to begin immediately; that the terms of Mother's visits may be modified by agreement of parties; that Mother be re-referred to the CEU for a forthwith drug screen. Mother's drug screen was positive for marijuana on October 6, 2015. On October 7, 2015, Child 2 and Child 3 were adjudicated dependent and committed to DHS. Mother was ordered for a forthwith drug screen, an evaluation with dual diagnosis, and monitoring to include three random drug screens prior to the next court date; that DHS refer Mother for a Parenting Capacity Evaluation; that Mother sign all appropriate release and consent forms; and that Mother comply with all medical requests. On January 4, 2016, January 6, 2016, and February 17, 2016, Mother tested positive for marijuana. On April 5, 2016, the CEU completed a progress report for Mother which showed that she rescheduled her court ordered drug and alcohol assessment multiple times before finally attending on March 21, 2016, at which time she refused to submit to a urinalysis causing the assessment to remain incomplete. At the April 6, 2016, permanency hearing, the court ordered that the

Children remain committed to DHS; that Mother's visitation may be further modified by agreement of parties; that Mother provide APM with her work schedule; that Mother be referred to the CEU for an assessment, forthwith drug screen, and three random drug screens; that Mother comply with the appointment for a Parenting Capacity Evaluation on April 22, 2016; that Mother be referred to BHS for monitoring, consultation and evaluation; that APM was permitted to sign IEP requests unless Mother agreed to sign within forty-eight hours; that Mother sign all consents for the Children; and that APM assist Mother with transportation for services. On July 22, 2016, Sibling passed away. On September 22, 2016, Mother's SCP objectives were modified so Mother was to attain reunification with the Children; to comply with a referral to ARC; to keep all visits with the Children; to cooperate with CUA services, including visits, communication, and signing documents; to confirm all visits with her Children twenty-four hours in advance; to obey all court orders; to attend the CEU for an assessment pursuant to the court's order; to comply with any recommendations made as a result of the CEU evaluation; to comply with requests for random drug screens within twenty-four hours of the request; to provide proof of individual therapy pursuant to the court's order; and to reschedule the second part of the Parenting Capacity Evaluation.

The Children are currently placed with foster parents in a safe, permanent, and pre-adoptive home. The Children call the foster parents "Mom" and "Dad." (N.T. 2/21/17, pgs. 59-60). The foster mother testified that she takes them to their routine medical appointments. (N.T. 2/21/17, pgs. 60-61). Child 2 receives specialty appointments and Child 1 attends treatment for autism at SPIN. (N.T. 2/21/17, pgs. 62-64). The foster mother testified that the Children are excited to see both their maternal grandmother ("MGM") at the beginning of visits and their foster parents at the end of the visits. (N.T. 2/21/17, pg. 65). The foster mother also testified that Child 1 recently returned from a visit with her mother ("Mother") and indicated that Mother told her that the foster mother was trying to buy her love by taking her to the movies and on vacations. The foster mother testified that Child 1 has since been acting unlike herself. (N.T. 2/21/17, pgs. 67-68). Child 2 also informed the foster mother that Mother told him to tell the judge that his foster brother hits him and shows him inappropriate material on the television. (N.T. 2/21/17, pg. 68). The foster mother testified that when she asked Child 2 whether he had seen anything wrong on the television, he said he had not and had

just seen dolphins and music videos. (N.T. 2/21/17, pgs. 74-75). After a doctor's appointment, Child 1 came home upset and tearful, asking when she would meet with the judge. When asked why she was upset, Child 1 told the foster mother that MGM had told her she had to tell the judge that she wanted to live with Mother and MGM. (N.T. 2/21/17, pgs. 71-72). When Child 1 asked whether she would be allowed to live with Mother and MGM, the foster mother told her she would talk to the case manager, but it was not a decision that the foster mother could make. After which, the foster mother testified that she brought Child 1 downstairs for some ice cream and television. (N.T. 2/21/17, pgs. 72-73).

A CUA case aid from APM who supervised visits between the Children and Mother and MGM testified that she had absolutely no concerns about the foster parent. (N.T. 2/21/17, pgs. 88-92). The APM supervisor to the case aid testified that the case aid and another worker reported that Mother, Child 1 and the case aid met in a separate room for an hour and it was mentioned that the foster brothers were picking on Child 1 and calling her names. (N.T. 2/21/17, pgs. 97-98, 122, 131). The allegation was investigated and APM determined that it was not sufficient to remove the Children from the foster parents' home. (N.T. 2/21/17, pg. 98-99). Another CUA worker testified that she characterized the foster brother's picking on Child 1 as a sibling picking on another sibling. (N.T. 2/21/17, pg. 134). The only concern brought to the supervisor regarding Child 2 was that his hair was not done, but discussion on the subject showed that he did not like his hair braided so it was instead kept in a ponytail. (N.T. 2/21/17, pgs. 100-101). Child 3 had recently been taken to the doctor for a new eczema cream prescription which was slowly clearing up a rash. (N.T. 2/21/17, pg. 100). The APM supervisor testified that there had not been any active investigation since she was assigned the case in July 2016. (N.T. 2/21/17, pgs. 100, 102). The APM supervisor also testified that placement with the foster parents over MGM is in the best interests of the Children because they have been with the foster parents for about ten months and are bonded to them. (N.T. 2/21/17, pgs. 107-108).

MGM testified that Child 1 was not getting the therapy that she needs and that Child 1 should have been in therapy for autism before, rather than just starting recently. (N.T. 2/21/17, pgs. 148-149). MGM also testified that Child 1's clothes are dirty and her hair is not done when attending visits. (N.T. 2/21/17, pg. 151). MGM also claims that Child 1 indicated that

she wanted to live with either MGM or Mother, not the foster parents. (N.T. 2/21/17, pg. 153). MGM also claimed that Child 1 indicated that the foster mother was bribing her with cellular phones and taking her places in order to convince her to stay there. (N.T. 2/21/17, pgs. 154-155). MGM claimed that Child 2 comes to visits without his hair done, using curse words, and saying that the foster mother hits him. (N.T. 2/21/17, pgs. 156-157). MGM testified that Child 2 showed her a bruise on his leg that he indicated came from the foster mother hitting him with a slipper. (N.T. 2/21/17, pg. 157). MGM also testified that Child 3 has been cursing and she complained that the foster mother was hitting her on the butt and legs. (N.T. 2/21/17, pg. 160). MGM also testified that Child 3's eczema was not being taken care of and looked irritated. (N.T. 2/21/17, pg. 161). MGM testified that she reported all incidents to the APM supervisor. (N.T. 2/21/17, pgs. 152, 155, 157-158).

Mother testified that she agreed with all of the issues laid out by MGM. (N.T. 2/21/17, pg. 179). Mother testified that Child 3 dances inappropriately for a three year old and claimed that the foster mother taught her to dance that way. (N.T. 2/21/17, pg. 179). Mother also testified that Child 3 comes to visits dirty and often has accidents from confusion in her potty training. (N.T. 2/21/17, pg. 181). Mother testified that Child 1 does not do her homework and attends school with an odor; Mother indicated that she called the school to find this information. (N.T. 2/21/17, pg. 183). Mother testified that Child 1 still has difficulty understanding the death of Sibling and thinks she can visit with Sibling. (N.T. 2/21/17, pg. 184). Mother testified that she is concerned that Child 1 is not receiving therapy outside of her school counselor. (N.T. 2/21/17, pg. 186). Mother also testified that Child 1 told her that the foster mother and CUA informed her that she was no longer allowed to speak to Mother. (N.T. 2/21/17, pgs. 192-193). Mother testified that CUA was notified about each incident by conversation and testimony at prior court hearings, but no one followed up with her about them. (N.T. 2/21/17, pgs. 180, 182). Mother also testified that she is unable to attend all of Child 1's appointments due to work, but MGM attends all of the Children's appointments. (N.T. 2/21/17, pgs. 199-200). The DHS witnesses were unwavering and credible, though Mother and MGM were not.

**Discussion:**

Mother raises the following errors on appeal:

1. That the lower court committed an error of law and abuse of discretion in denying Mother's request for a permanency hearing pursuant to 42 Pa. C. S. § 6351 (e).

2. That the lower court committed an error of law and abuse of discretion in establishing and/or maintaining a concurrent plan for adoption without a hearing pursuant to 42 Pa. C. S. § 6351 (e). See also, In Re Z.V., 1211 EDA 2016, Memorandum Opinion J-S89032-16, January 24, 2017, Motion to Publish GRANTED February 17, 2017.

3. That the lower court committed an error of law and abuse of discretion by ordering Mother to prosecute a "Judicial Removal" hearing in lieu of a permanency hearing.

4. That the lower court committed an error of law and abuse of discretion by forbidding Maternal Grandmother, without cause, from continuing to attend the children's appointments for medical and special services.

Mother's issues 1, 2, and 3 will be consolidated as: Did the trial court err or abuse its discretion when it held a review hearing as to whether it was in the best interest of the Children to be removed from their pre-adoptive foster home, and maintained the concurrent plan for adoption? Mother's issue 4 will be dealt with on its own merit.

A court may conduct permanency hearings for the purpose of determining or reviewing the permanency plan of the child and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. See 42 Pa. C.S. §6351(e). A change in a child's permanency goal is governed by the Pennsylvania Juvenile Act at a permanency review hearing. See 42 Pa. C.S. §6351 (f). The trial court must focus on the Children and determine the goal in accordance to the Children's best interests, not those of the parents. In re S.B., 943 A.2d 973, 978 (Pa. Super.2008). "Safety, permanency and well-being of the child must take precedence over all consideration. "See id. (Citing In re N.C., 909 A.2D 8/8, 823 (Pa. Super. 2006)). Section 6351 (f) lists matters to be determined at a permanency hearing[2]. An important aspect of permanency review hearings is the

---

[2] The Juvenile Act controls the disposition of dependent children. Section 6351 (f) Matters to be determined at permanency hearing. At each hearing, the court shall:

(1) determine the continuing necessity and appropriateness of the placement;

appropriateness of the placement as well as whether the current placement goal for the child is appropriate and feasible. (42 Pa. C.S. §6351(f)(1) and (4)).

At the time of this review hearing, Child 1 had already been in DHS care two times. Child 1, the oldest child, has been in care for twenty months and the younger children, Child 2 and Child 3, have been in care for seventeen months. The City Solicitor filed termination and goal change petitions on December 16, 2016. (N.T. 2/21/17, pgs. 9-10). It was Mother's counsel's allegations that the pre-adoptive foster home was not appropriate and it was in the best interests of the Children to be moved to MGM. However, the trial court had already heard extensive testimony about the efforts that CUA had made to investigate MGM as a possible kinship resource for all the Children at the review hearing on December 19, 2016. After hearing the testimony, the trial court found that maternal cousin's home, with whom MGM lives, is not appropriate for kinship. (N.T. 12/19/16, pgs. 57, 59). Consequently, the review hearing on February 21, 2017, was limited in scope to the appropriate placement of the Children as requested by Mother's counsel. (N.T. 2/21/17, pg. 52; N.T. 12/19/16, pgs. 97-98, 100). It should be noted that at the time of the February 21, 2017, hearing, the case was in compliance with the Juvenile Act, whereby a permanency hearing is to occur every six months. (42 Pa.C.S.A. § 6351(e)). The last permanency review hearing had been on December 19, 2016. The court, therefore, did not err or abuse its discretion in limiting the scope of the February 21, 2017, permanency review hearing to placement and testimony regarding removal of the Children from the pre-adoptive foster home.

The Children are in a safe, permanent, and pre-adoptive home. The Children call the foster parents "Mom" and "Dad." (N.T. 2/21/17, pgs. 59-60). The foster parents take care of all the Children's needs. (N.T. 2/21/17, pgs. 60-61, 72-73, 107-108). The foster parents also make sure that the Children attend all of their medical appointments. (N.T. 2/21/17, pgs. 60-64). Child 3 had recently been to the doctor for a new prescription of eczema cream, which was

---

(2) determine the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child;
(3) determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;
(4) determine the appropriateness and feasibility of the current placement goal for the child;
(5) project a likely date by which the goal for the child might be achieved;
(6) determine whether the child is safe.

slowly clearing up her rash. (N.T. 2/21/17, pg. 100). The APM supervisor testified that the Children have been with the foster parents for about ten months and are bonded to them. (N.T. 2/21/17, pgs. 107-108). Mother and MGM testified that the Children were arriving to visits dirty and they complained of being hit by the foster mother. (N.T. 2/21/17, pgs. 156-157, 160, 179, 181). MGM and Mother's testimony relate almost the same concerns that previously had been heard by the trial court at the extensive permanency review hearing on December 19, 2016. (N.T. 2/21/17, 148-158, 179-186). Mother admitted to such and that there was no follow up. (N.T. 2/21/17, pgs. 180, 182). However, the APM supervisor testified that prior investigations showed that there was not a sufficient showing that necessitated a removal of the Children from the home. (N.T. 2/21/17, pgs. 98-99, 100, 102). The CUA case aid from APM also testified that she had absolutely no concerns about the foster parent. (N.T. 2/21/17, pgs. 88-92). The court heard testimonial evidence that overwhelmingly supported that the Children should not be removed from the care of the foster family. (N.T. 2/21/17, pgs. 107-108). The Children are still in the least restrictive placement that meets the needs of the Children and no other least restrictive alternative is available. The Children's placement with the foster parent is appropriate. The Children are safe, and it is in their best interests to remain with the foster parents. The trial court did not err or abuse its discretion when it found that the Children should not be removed from the home.

The goal plan for the Children on February 21, 2017, was still reunification with Mother. A goal change had not yet occurred. The Court noted at the end of the hearing that the goal had only been changed at the SCP level, not by the court. (N.T. 2/21/17, pg. 209). However, since the trial court properly found that the Children should not be removed from their pre-adoptive home, a concurrent goal of adoption would not be improper.

Standing in a dependency proceeding is granted to a person if the person is a parent of the children, stands in loco parentis to the children, or cares for or controls the child. See _In re J.P._, 832 A.2d 492 (Pa. Super. Ct. 2003); _In re L.J._, 691 A. 2d 520 (1997). Mother was ordered to attend the Children's medical appointments, once scheduled. As the Children's Mother, Mother has authority to sign any releases or consents necessary for the Children's medical needs and well-being. MGM does not have standing to participate in the dependency

proceeding as she is not a parent of the Children, does not stand in loco parentis to the Children, and does not care for or control the Children. MGM does not have any authority to sign any releases or consents for the Children. In order to ensure that Mother took responsibility for attending the Children's appointments, MGM was ordered not to attend any further appointments for the Children. In addition, MGM's attendance of the Children's medical appointments, specifically Child 1's medical appointments, causes distress to the Children as evidenced by testimony. MGM was having inappropriate conversations with Child 1 about the case to influence the child to request the trial court to return to Mother and also live with MGM. (N.T. 2/21/17, pgs. 71-72). The trial court found that Mother and MGM were not credible. Therefore, the trial court did not err or abuse its discretion when it forbade MGM from attending any further doctor's appointments for the Children.

**Conclusion:**

For the aforementioned reasons, the trial court did not abuse its discretion in finding that the Children should not be removed from their pre-adoptive home. It is in the Children's best interest to remain with their current foster parent. Similarly, the trial court did not abuse its discretion when it ordered MGM not to attend the Children's medical appointments. Accordingly, the Order entered on February 21, 2017, should be affirmed.

By the court,

Joseph Fernandes, J.

# IN THE COURT OF COMMON PLEAS
## FOR THE COUNTY OF PHILADELPHIA
### FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of R. C.-E., a minor | : | CP-51-DP-0002538-2015 |
| | : | |
| In the Interest of G. C.-E., a minor | : | CP-51-DP-0002539-2015 |
| | : | |
| In the Interest of A. M., a minor | : | CP-51-DP-0001077-2013 |
| | : | |
| | : | 51-FN-002084-2013 |
| | : | |
| APPEAL of: J.C., Mother | : | 931/932/933 EDA 2017 |

### Proof of Service

I hereby certify that this court is serving today, May 24, 2017, the enclosed Opinion upon the following persons:

Katherine Holland, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Attorney for DHS

Lisa Barrimond, Esq.
1441 Sansom Street
Philadelphia, PA 19102
Attorney for Appellee/Children

Maureen Pié, Esq.
8 Summit Street, Suite 200
Philadelphia, PA 19118
Attorney for Appellant/Mother, J.C.

Edelina Schuman, Esq.
2811 Ogden Street
Philadelphia, PA 19130
Attorney for Father

By: _Vijaya Singh_

Vijaya P. Singh
Law Clerk to the Hon. Joseph Fernandes
Philadelphia Family Court
1501 Arch Street, Suite 1431
Philadelphia, PA 19102
Telephone: (215) 686-2660